**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 22 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

CLINTON D. BROWN,

     Plaintiff-Appellee and Cross-Appellant,

v.

EDMUND BRUCE GRAY, individually,

     Defendant-Cross-Claimant and Cross-Appellee,

v.

DENVER MANAGER OF PUBLIC SAFETY,

     Defendant-Cross-Defendant and Cross-Appellee,

and

CITY AND COUNTY OF DENVER,

     Defendant-Cross-Defendant-Appellant and Cross-Appellee.

Nos. 99-1134, 99-1164 & 99-1232

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 95-N-2582)

Theodore S. Halaby (E. James Wilder, with him on the briefs), of Halaby Cross & Schluter, Denver, Colorado, appearing for Defendant-Appellant.

Joseph J. Mellon, of The Mellon Law Firm, Denver, Colorado, and Dwight L. Pringle, of Collins and Pringle, LLC, Denver, Colorado, appearing for Plaintiff-Appellee.

_____

Before **SEYMOUR**, Chief Judge, **LUCERO,** Circuit Judge, and **ELLISON,**[*] District Judge.

_____

**SEYMOUR**, Chief Judge.

_____

[*]The Honorable James O. Ellison, Senior District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

This civil rights lawsuit stems from the shooting of an unarmed motorist by an off-duty police officer. After settling with the officer, the motorist, Clifton Brown, filed a lawsuit against Denver under 42 U.S.C. § 1983. Denver appeals the denial of its motions for judgment as a matter of law and for a new trial following an adverse jury verdict. Mr. Brown cross-appeals the district court's refusal to grant his motion for judgment on a cross-claim assigned to him by the officer, and the court's failure to award him certain out-of-pocket expenses as attorney's fees. For the reasons set forth below, we affirm with respect to Denver's motions, and reverse with respect to Mr. Brown's assigned cross-claim and request for out-of-pocket expenses.

I

On the afternoon of December 13, 1994 , Clifton Brown was running errands in his neighborhood. As he drove down the street, he became involved in a traffic dispute with another driver, Edmund Gray, who was a police officer for the City and County of Denver. Officer Gray was not on regular shift, was driving his own car, and was not in uniform. According to Mr. Brown, the two men exchanged insulting hand gestures and thereafter Mr. Brown noticed Officer Gray following and tailgating him for several blocks. The two cars stopped at a traffic light. Officer Gray got out of his car, walked up to Mr. Brown's car, and

drew his service revolver out of his jacket. Officer Gray pointed the gun at Mr. Brown's face and shouted that he was a police officer, but he did not display a badge or other identification.

The light turned green and Mr. Brown made a U-turn. Officer Gray returned to his car and followed. Mr. Brown stopped on the shoulder of the road in order to get Officer Gray's license plate number. Officer Gray pulled up close to him, got out of the car, and again approached Mr. Brown with his gun drawn, shouting. Mr. Brown put his hands up and said, "What the hell do you want? I don't have a damn thing." App., vol. I at 300, 301. Officer Gray again pointed the gun at Mr. Brown's face, at which time Mr. Brown put the car in gear and started to drive away. Officer Gray fired several shots into the car, hitting Mr. Brown approximately three times. Badly injured, Mr. Brown drove a few blocks away, summoned help, and was taken to the hospital.[1]

Officer Gray's version of the events is quite different. He claims that, after the traffic dispute, Mr. Brown brandished a weapon at *him*, committing the crime of felony menacing. He therefore attempted to arrest Mr. Brown pursuant to

---

[1]The shooting caused Mr. Brown a collapsed lung, shattered ribs, and extensive nerve and muscle damage in his neck, chest, and arm. He required months of physical therapy and additional surgery to remove bullet fragments from his neck, and he experienced both depression and post-traumatic stress disorder. He still suffers from constant pain and decreased mobility, and one of the bullets remains lodged in his shoulder.

Denver Police Department policy. Officer Gray contends the second time he approached Mr. Brown's vehicle he ordered Mr. Brown to keep his hands visible. Instead of obeying this order Mr. Brown reached down to his right, brought his hand up, and began driving away. Officer Gray claims he fired because he feared Mr. Brown was both reaching for a weapon and attempting to flee.

Mr. Brown brought this lawsuit against Officer Gray, asserting various state and federal claims. He also sued the City and County of Denver, asserting a claim under 42 U.S.C. § 1983 for deficiencies in Denver's police officer training and seeking indemnification for the acts of Officer Gray under the Peace Officers Act, Colo. Rev. Stat. § 29-5-111. Officer Gray cross-claimed against Denver under the Peace Officers Act and the Governmental Immunity Act, Colo. Rev. Stat. § 24-10-110, seeking indemnification and the costs of his defense against Mr. Brown's action.

Mr. Brown and Officer Gray settled prior to trial. Pursuant to their settlement agreement, Officer Gray stipulated to the entry of judgment against him in the amount of $150,000, and assigned to Mr. Brown his claim for indemnity from Denver. Officer Gray also assigned Mr. Brown his cross-claim for defense costs. The district court granted their motion to substitute parties on the cross-claims, effectively upholding the assignment.

After the settlement, Mr. Brown proceeded to a jury trial against Denver on the section 1983 claim and the state claims for indemnification of Officer Gray and for his costs of defense, which had been assigned to Mr. Brown. Based on its reading of the statutes, the district court decided the state claims could only succeed if Officer Gray was acting within the scope of his employment when he shot Mr. Brown. Accordingly, the court gave the jury a special verdict form which required it to determine both whether Mr. Brown had proven the elements of his section 1983 claim and whether Officer Gray was acting within the scope of his employment. The jury returned a verdict in favor of Mr. Brown on the section 1983 claim, but answered the second question in the negative. The district court therefore entered judgment for Mr. Brown on the section 1983 claim only, for $400,000.

A series of motions followed. Denver filed a Motion to Amend Judgment, asking the court to specifically enter judgment in its favor on the indemnification claims. Mr. Brown did not oppose this motion, and the district court granted it in a later order. Denver also filed a Motion for Judgment as a Matter of Law, arguing the evidence at trial was insufficient to establish municipal liability under section 1983. In the alternative, Denver moved for a new trial based upon an allegedly defective jury instruction. The court denied both of these motions.

Mr. Brown filed a Motion for Entry of Judgment on the assigned cross-claim for the costs of Officer Gray's defense, which amounted to $123,293.77. The court denied this motion, reasoning that the Governmental Immunity Act would have required Officer Gray to reimburse Denver for the costs of his defense because the jury found he was acting outside the scope of his employment. Mr. Brown also applied to recover attorney's fees under 42 U.S.C. § 1988, and costs under 28 U.S.C. § 1920. The court awarded most of the requested fees and costs, but declined to include certain out-of-pocket expenses in the attorney's fee award.

Denver appeals the denial of its motions for judgment as a matter of law and a new trial. Mr. Brown cross-appeals the district court's denial of his motion for judgment on the assigned cross-claim for defense costs. Mr. Brown also cross-appeals the court's failure to include out-of-pocket expenses in the fee award.

## II

### A. Sufficiency of the Evidence

Denver argues the district court erred in refusing to grant it judgment as a matter of law on the basis that Mr. Brown failed to meet the evidentiary requirements necessary to establish municipal liability for Officer Gray's actions.

We review the district court's denial of a motion for judgment as a matter of law de novo, applying the same legal standard as the district court. *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (citing *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1241 (10th Cir. 1999)). A party is entitled to judgment as a matter of law only if the "evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Id.* (internal quotations omitted). In reviewing the record, we "will not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." *Id.* Judgment as a matter of law is appropriate if there is no legally sufficient evidentiary basis for a claim under the controlling law. *See id.* We consider the evidence, and any inferences drawn therefrom, in favor of the non-moving party. *See id.*

At trial Mr. Brown argued for municipal liability based on a "failure to train" theory, which was first endorsed by the Supreme Court in *City of Canton v. Harris*, 498 U.S. 378 (1989). Specifically, Mr. Brown claimed Denver failed to train its officers adequately with respect to implementing the following Department policies:

> Rule and Regulation 107 – Always on Duty
> Officers are held to be always on duty, although periodically relieved from their routine performance of it. . . . [T]he fact that they may be technically off-duty shall not relieve them from the responsibility of taking proper police action in any matter coming to their attention. When there is no urgent or immediate need for police action, they may request the dispatcher

to turn the matter over to officers on duty in the district, but they shall take such police action as may be required prior to the arrival of the dispatched officers.

App., vol. I at 111.

> Rule and Regulation 805 – Equipment Carried on Person
> Officers shall . . . be armed at all times . . . .

*Id.* at 112. Both of these policies were in effect on the day of the shooting. They will be referred to collectively in this opinion as the "always armed/always on duty" policy.

Mr. Brown maintained that police officers were not instructed how to take "police action" when they were off-shift and without their uniforms, police vehicles, radios, and other accouterments of law enforcement. He contended that despite the different circumstances presented when an officer is off-shift, the officer training program purposefully did not distinguish between on-shift and off-shift scenarios. Officers were instead told to respond as though they were on-shift in all situations. Consequently, Officer Gray believed he was required to take police action after he thought he saw Mr. Brown brandish a gun. However, he could not properly pull Mr. Brown over because he was not in his patrol car, failed to adequately identify himself as a police officer because he was not in uniform, and inappropriately escalated the violence level of the encounter because he was unable to call for back-up.

In order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Allen v. Muskogee*, 119 F.3d 837, 841-842 (10th Cir. 1997) (citing *City of Canton*, 489 U.S. at 389-91)). Denver argues Mr. Brown failed to provide sufficient evidence that the training program was inadequate in the first instance. In addition, while conceding that Officer Gray's use of force exceeded constitutional limitations, Denver disputes the sufficiency of the evidence of the remaining three requirements.

We first address whether the jury was presented with sufficient evidence to conclude that Denver's training with respect to implementing its always armed/always on duty policy was inadequate. "[A] showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate." *Allen*, 119 F.3d at 842. In a failure to train case where, as here, the policy itself is not unconstitutional, a single incident of excessive force can establish the existence of an inadequate

-10-

training program if there is some other evidence of the program's inadequacy. *See Allen*, 119 F.3d at 844-45 (citing cases).

Denver claims, somewhat disingenuously, that Mr. Brown put on no evidence at trial of an inadequate training program other than the evidence of the shooting itself.[2] *See* Appellant's Br. at 19. The record belies this assertion. At trial, Captain Michael O'Neill, a twenty-nine year veteran of the Department and former commander of the police academy, testified that the officer training program makes no distinction between off-duty and on-duty scenarios because they are considered to be the same. *See* App., vol. II at 39. Patrick Murphy, an expert witness with an extensive background in police policies, procedures, and training practices, testified about the risks to citizens and officers of requiring officers to take police action while off-shift. *See id.* at 76-77. If a police department is to adopt an always armed/always on duty policy, he stated, it is imperative that officers be trained on how to take police action in the different

---

[2] We are compelled to point out that Denver's opening and reply briefs are replete with instances in which it misstates the law and misrepresents the facts contained in the record. Moreover, this is not the first time counsel for Denver has attempted to deceive this court in a case of this nature. *See Zuchel v. City & County of Denver*, 997 F.2d 730, 737 & n.2 (10th Cir. 1993) (observing that Denver "misstates both the applicable theory of liability and the record," and that "throughout the proceedings . . . Denver has mischaracterized the record and has at times arguably misrepresented it"). While we will not comment on every instance of such mendacity in the present case, we wish to make clear this unprofessional conduct has not gone unnoticed. Further conduct of this nature may subject counsel for the City to sanctions.

circumstances presented when they are off-shift. *See id.* at 76 ("It's very important that officers be given considerable training as to how they will perform differently when off duty, and especially if a firearm is involved."). Mr. Murphy concluded that Denver's failure to provide any training in this area was inappropriate, inadequate, and insufficient.[3] *See id.* at 69, 74-77, 126-27, 129.

In addition, the jury was read portions of Officer Gray's deposition in which he testified he felt ill-equipped to handle the encounter with Mr. Brown because he lacked his uniform, patrol car, and radio. Officer Gray clearly and repeatedly testified he had never received training in how to handle this type of situation when he was off-shift:

> Now if they had issued a radio to carry all the time, I would have effectuated an arrest immediately. I would have called for backup. . . . I was never trained off duty as to what to do in a situation like that. . . . I was trained in an on-duty capacity, sir, to call for backup, take the suspect out at gunpoint. I was not trained in an off-duty capacity to handle this

---

[3]Denver maintains that the Supreme Court specifically found expert testimony evidence insufficient to prove inadequate training in *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). This assertion is incorrect. The problem in *Tuttle* was that the trial court had instructed the jury it could infer the existence of an inadequate training policy *solely* from a single incident of excessive force. *See id.* at 821. This allowed the jury to disregard the independent evidence, which included expert testimony, that the plaintiff offered to prove inadequate training. *See id.* at 821-22 ("The fact that in this case respondent introduced independent evidence of inadequate training makes no difference, because the instruction allowed the jury to impose liability even if it did not believe respondent's expert at all."). Thus, the Supreme Court never found expert testimony to be insufficient in this context; to the contrary, it *required* such additional evidence for a jury to find municipal liability for a single incident of excessive force.

situation. . . . It's a different situation than if I were in a uniform where [Mr. Brown] could see the marked patrol car. . . . I would have the opportunity to call for back-up. . . . I'm trained in an on-duty capacity, . . . I never have been trained in an off-duty capacity. . . . I was told that you are on duty 24 hours a day.

*Id.* at 160-63; *see also id.* vol. I at 398. Officer Gray also testified he was instructed that simply identifying himself verbally as a police officer while off-shift should be sufficient to require a citizen to accede to his demands. *See id.* at 399; App., vol. II at 181-82.

This evidence, along with the shooting itself, provided a sufficient basis for the jury to determine that Denver's training program with respect to implementing the always armed/always on duty policy in off-shift scenarios was inadequate. We turn now to the sufficiency of proof of the latter three requirements of the failure to train cause of action.

### 1. *Usual and Recurring Situation*

To satisfy the second requirement, Mr. Brown was required to establish that the excessive use of force occurred in circumstances constituting a usual and recurring situation with which officers must deal. Denver begins its argument on this issue by misrepresenting the applicable law. Citing us to *City of Canton*, 489 U.S. at 397, Denver claims that in order to satisfy this requirement, Mr. Brown must provide evidence "at least of a pattern of similar incidents in which citizens were injured or endangered." Appellant's Br. at 18. Denver concludes that

-13-

because the shooting was an isolated occurrence, Mr. Brown failed to make this showing. However, Denver neglects to mention that the above-quoted phrase appears as part of a parenthetical description of a Fifth Circuit holding in a case from 1983 cited in a separate opinion in *City of Canton*. As such, this is hardly a correct assessment of the showing Mr. Brown must make to satisfy the usual and recurring situation requirement.[4]

Rather, Mr. Brown must show that the situation Officer Gray was faced with on the day of the shooting was "common" (or at least not "uncommon"), *Allen*, 119 F.3d at 842, "likel[y]," *id.* at 845; "foreseeable," *Zuchel*, 997 F.2d at 738, or "predictable," *id.* The situation need not be frequent or constant; it must merely be of the type that officers can reasonably expect to confront. Other circumstances that constitute usual and recurring situations for police include individuals requiring medical care while in custody, *City of Canton*, 489 U.S. at 387-89, arrests of fleeing felons, *id.* at 390 n.10, and encounters with armed mentally ill people, *Allen*, 119 F.3d at 842.

In the present case an off-shift police officer witnessed what he believed was criminal activity and felt he was required to intervene because of the always armed/always on duty policy. Evidence at trial demonstrated that Denver officers

---

[4]We are left to wonder whether Denver actually believed we would not notice this.

are often alerted to suspected criminal behavior at some point when they are off-shift. In fact, the existence of the always armed/always on duty policy itself indicates that the likelihood was at least common enough to warrant a policy regarding it. Captain O'Neill testified:

> [W]hen off duty, we are regularly contacted by neighbors, friends, family, associates to deal with their issues . . . . [I]t's not unusual to have somebody run up and pound on your door and say that a burglar is inside their house . . . or they'll call you before they call the police on some type of emergency at their home. Or we walk into 7-Eleven and there's some kind of craziness going on there.

App., vol. II at 22-23. The comprehensive nature of the policy, which allows no period of time when officers are truly off duty, increases the likelihood that an officer will feel required to take police action while off-shift. All of this evidence supports the jury's determination that the circumstances preceding the off-shift shooting constituted a usual and recurring situation.

### 2. *Deliberate Indifference*

To satisfy the third requirement for liability, Mr. Brown had to prove the inadequate training evidenced deliberate indifference on the part of Denver. *See City of Canton*, 489 U.S. at 388. A finding of deliberate indifference in this situation requires a showing that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need," *id.* at 390. The touchstones of this inquiry,

-15-

therefore, are the risk inadequate training poses and the city's awareness of that risk.

Denver contends Mr. Brown provided insufficient evidence of deliberate indifference because he failed to prove the existence of a pervasive problem with the training program and that Denver's chief of police was personally aware of the problem and deliberately chose to ignore it. None of the Supreme Court or Tenth Circuit failure to train cases require the plaintiff to prove the existence of a pervasive problem. Nor must the plaintiff present explicit evidence that the chief of police was personally aware of and chose to ignore the problem.[5] Rather, the plaintiff must show that a policymaker, which could be the chief of police, among others, was deliberately indifferent. *See*, *e.g., City of Canton*, 489 U.S. at 389, 390 n.10; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); *Tuttle*, 471 U.S. at 823, 824; *Allen,* 119 F.3d at 833-844.

---

[5]Denver actually suggests in its brief that Mr. Brown's claim should fail because he did not call the chief of police to testify. This fixation with the chief of police appears to come from our decision in *Zuchel*, in which we stated that a jury instruction requiring "deliberate indifference on the part of the city's chief of police" was correct. *Zuchel*, 997 F.2d at 734-35. The facts of that case, however, involved personal communications about the city's training policies between the chief of police and the district attorney. Our determination there that it was not error for the trial court to instruct the jury in light of the specific evidence in no way established a requirement that plaintiffs must prove the deliberate indifference of the police chief as an individual in all failure to train claims.

In this case, Mr. Brown offered sufficient evidence for the jury to conclude that Denver was deliberately indifferent to the risks posed by the inadequate training. Throughout the course of his testimony, Captain O'Neill was treated by both parties as a policymaker. He stated that when he was commander of the police academy, he was basically "in charge" of training. App., vol. I at 404. Later he testified that he was "the expert" with respect to police training by virtue of his position as commander of the academy. App., vol. II at 32. Both parties questioned Captain O'Neill about the rationale behind the Department's failure to train on the always armed/always on duty policy. He invariably supplied the reasoning underlying the decision, and often referred to himself as a decision-maker.[6] Denver never made any argument or put on any evidence to the contrary. As we said in *Allen*, 119 F. 3d at 844 n.1, "[t]here is no contention that the training given the officers was anything other than official city policy."

---

[6] For example, the following exchange took place between Captain O'Neill and Mr. Brown's counsel:

> Q:   [A]ll of the . . . hours of academy training with respect to police tactics, procedures, rules and regulation don't make a distinction between on duty and off duty because *you* believe it's all the same; is that fair to say?
>
> A:   Yes, sir.

App., vol. II at 39 (emphasis added).

-17-

Captain O'Neill testified repeatedly that a conscious decision was made not to distinguish between on-shift and off-shift scenarios in the training program because it was believed they were all the same, despite the fact that off-shift officers would be without their radios, uniforms, and marked police cruisers. *See* App., vol. II at 4-7, 18 (adopting a statement by defense counsel), 19, 24, 39. He also stressed that no distinction was made between on- and off-shift incidents due to the important nature of the job and the significant role police officers play in the community. *See id.* at 18-19. Captain O'Neill candidly acknowledged that the always armed/always on duty policy was risky for officers, see App., vol. II at 24 ("We've lost a number of officers this way, although we've had quite a number of successful arrests. . . ."), but insisted that no further training was necessary for its implementation.

Patrick Murphy testified that this deficiency in the training was a pervasive problem, *see id.* at 78, creating a dangerous situation in which a shooting was the foreseeable result, *see id.* at 84. He also testified that, in his opinion, Denver's failure to provide training that distinguished between on- and off-shift situations constituted deliberate indifference. *See id.* at 78-79.

The always armed/always on duty policy was part of the Department's written regulations. Expert testimony established that always armed/always on duty policies present serious safety risks, to officers and to the public, if officers

-18-

are not trained in off-shift implementation. Captain O'Neill knew to a moral certainty that the policy would result in some officers taking police action while off-shift, yet he pursued a training program that did not adequately prepare the officers to do so. The failure to train officers in implementing this policy was, by Captain O'Neill's own admission, a conscious decision based on the perception that on-and-off-shift situations were the same. The jury was thus presented with sufficient information to conclude that Denver policymakers were aware of and deliberately indifferent to the risks presented by the training program's deficiencies. Where, as here, the evidence supports a reasonable inference favorable to the jury verdict, the fact that a contrary inference may be drawn does not mandate the entry of judgment as a matter of law. *See Zuchel*, 997 F.2d at 741.

### 3. Direct Causal Link

Finally, Mr. Brown had to prove there was a causal connection between the constitutional violation and the inadequate training. In *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658 (1978), the Supreme Court held that a municipality cannot be liable under Section 1983 on a respondeat superior theory for merely employing a tortfeasor. *See id.* at 691; *see also Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989). Rather, municipalities are subject to liability only

for their official policies or customs: "[I]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 at 694. Therefore, in order for liability to attach in a failure to train case, "the identified deficiency in a city's training program must be closely related to the ultimate injury," *City of Canton*, 489 U.S. at 391, so that it "actually caused" the constitutional violation, *id.*

Denver argues there was no direct causal link between the inadequate training and the shooting because the jury found Officer Gray was acting outside the scope of his employment. Specifically, Denver claims the shooting was personal in nature, a manifestation of "road rage" rather than a misguided police action. This argument fails for two reasons. First, the fact that the jury found Officer Gray was not acting in the scope of his employment is of no consequence to Mr. Brown's section 1983 action. The scope of employment inquiry was related to the district court's interpretation of the Colorado statutes, and this standard is not a part of the section 1983 claim.[7] Although Denver argues this point on appeal, its defense counsel apparently conceded the issue at trial. *See*

---

[7]Section 1983 does require that the constitutional deprivation consist of action taken under color of law in order for a cause of action to lie in the first instance. The under color of law requirement applies to unconstitutional actions taken without the authority of the state. *See Monroe v. Pape*, 365 U.S. 167, 187 (1961), overruled on other grounds by *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658 (1978) . In this case, the jury found Officer Gray was acting under color of law when he shot Mr. Brown.

App., vol. II at 195 ("I think we all agree that scope of authority is not an element in the 1983 claim against the City. . . .").

Denver's argument also fails because the jury clearly was presented with sufficient evidence to conclude Officer Gray's actions were directly attributable to his position as a Denver police officer and to the dearth of instruction he received on implementing the always armed/always on duty policy while off-shift. Officer Gray repeatedly testified that he was attempting to make what he believed was a lawful arrest pursuant to that policy when he shot Mr. Brown. *See* App., vol. II at 158-59, 160, 163, 181. His testimony is buttressed by the uncontroverted evidence that he shot Mr. Brown with his service revolver, which the Department required him to carry at all times, and at least once identified himself as a police officer prior to the shooting. After reading Officer Gray's testimony and reviewing the police department's training policies, Mr. Brown's expert, Patrick Murphy, concluded Officer Gray believed he was acting as a police officer at the time of the shooting. He attributed the incident to improper training, stating:

> I think he saw himself as a police officer clearly and dealt with it as an on-duty police officer should, in his opinion. . . . I don't think it was appropriate, but I – in my opinion, it explains what he did; that he believed there was a gun and he believed he should do what he did. . . . I believe he felt that this was how he was trained, and from all of the materials I've read, I conclude that that's how he was trained.

*Id.* at 80.

Denver persists in arguing, without evidence to support its assumption and in contradiction to Officer Gray's testimony, that Officer Gray's actions were the result of personal rage and therefore not related to an official policy.[8] But mere repetition of this theory is not sufficient to convince us the jury's determination should be overturned. The jury found the shooting was directly related to Officer Gray's position as a police officer and the Department's failure to train him regarding the always armed/always on duty policy. The jury was presented with sufficient evidence on which to base this finding, and we will not disturb it simply because Denver feels its argument is more persuasive.

Mr. Brown presented sufficient evidence to sustain the jury's determination that he established the requisite elements of his failure to train claim against Denver. Consequently, the district court properly denied Denver's motion for judgment as a matter of law.

## B. Jury Instructions

Alternatively, Denver asserts the trial court erred in refusing to grant its motion for a new trial due to an allegedly defective jury instruction regarding the deliberate indifference requirement. We review a district court's decision whether

---

[8]Denver also argues there was no direct causal relation between the policy and the shooting because Officer Gray knew he was not supposed to intervene in "mere traffic matters" while off-shift. This unsupported contention is irrelevant here. Officer Gray testified that he intervened because he thought Mr. Brown brandished a weapon at him, committing the serious crime of felony menacing.

to give a particular instruction for an abuse of discretion. However, we conduct a de novo review to determine whether, as a whole, the instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. *See United States v. Jackson*, 213 F.3d 1269, 1290 (10th Cir. 2000) (citing *United States v. Beers*, 189 F.3d 1297, 1300 (10th Cir. 1999)). A party is not entitled to an instruction which lacks a reasonable legal and factual basis. *See id.*

Denver submitted a proposed jury instruction on deliberate indifference, which required Mr. Brown to prove "[t]hat the decision-making authority of the City was personally given notice of such a widespread practice and made a conscious decision to do nothing to change the practice." App., vol. I at 220. The court refused to give this instruction. Over Denver's objection, the court instead instructed the jury that to prove deliberate indifference Mr. Brown needed to show that "[t]he need for more or different supervision or training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy of the City can be said to have been deliberately indifferent to the need." *Id.* at 260 (Instruction 4.8.2).

On appeal Denver argues the jury should have been instructed it had to find the City's chief of police was deliberately indifferent to the need for more training, despite the fact that its tendered and rejected instruction made no

specific mention of the chief of police. This argument fails for several reasons, the most salient of which is the fact that the instruction given by the district court precisely tracked the language the Supreme Court used to describe deliberate indifference in *City of Canton*, 489 U.S. at 390, and as such is clearly correct. Moreover, an examination of the instructions as a whole indicates they accurately stated the governing law and provided the jury with an ample understanding of the issues. Denver's tendered instruction, in contrast, incorrectly stated the law and muddled the facts.[9] As the previous section on sufficiency of the evidence makes clear, there is no requirement that a plaintiff in a failure to train case prove the chief of police was personally deliberately indifferent to the inadequate training program. Denver's proposed instruction lacked a reasonable legal and factual basis, and the district court was correct to refuse it.

---

[9]The tendered instruction Denver cites us to addresses whether there was "inadequate psychological evaluation of potential officers," but does not mention the adequacy of the officer training program. App., vol. I at 220. Another tendered instruction on deliberate indifference refers to both the psychological evaluation of potential officers and the adequacy of the training program. *See id.* at 219. The psychological evaluation of potential officers does not appear to have been part of Mr. Brown's theory of the case, *see id.*, vol. II at 238, and we are not sure why the concept makes an appearance in these instructions. This confusion may well have been an oversight on Denver's part, although given its conduct before this court we cannot be so sure. In any event, such instructions would have no doubt bewildered the jury even if they did correctly state the law.

In sum, we are convinced the district court correctly denied Denver's motion for judgment as a matter of law and for a new trial. We now turn to the cross appeal.

## III

### A. Assigned Cross Claim for Defense Costs

The parties raise several arguments concerning Officer Gray's assigned cross-claim, brought under Colorado's Peace Officer's Act and Governmental Immunity Act, for $123,293.77 in defense costs.[10] As previously noted, the district court made recovery on these claims contingent upon a finding that Officer Gray was acting within the scope of his employment when he shot Mr. Brown. The jury found he was not. The court denied Mr. Brown's motion for the costs of Officer Gray's defense because it believed the Governmental Immunity Act would require Officer Gray to reimburse Denver for them. In other words, even if Denver paid the costs, the court thought it would be futile to allow Mr. Brown to collect them on assignment from Officer Gray because Officer Gray would only have to pay them back to Denver. Mr. Brown argues that the district

---

[10]This claim is not to be confused with Officer Gray's cross-claim for indemnification, on which the district court entered judgment in favor of Denver and which is not before us on appeal.

court misapprehended the state statutes, and that the reimbursement requirement does not apply to Officer Gray.

We review a district court's determination of state law de novo. *See Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991); *May v. National Union Fire Ins. Co.*, 84 F.3d 1342, 1345 (10th Cir. 1996). In order to ascertain whether the district court correctly denied Mr. Brown's motion for defense costs on the grounds that the Governmental Immunity Act would require Officer Gray to reimburse Denver, we must examine two state statutes.

The Governmental Immunity Act provides, in relevant part:

> Where a claim against a public employee arises out of injuries sustained from an act or omission of such employee which occurred or is alleged . . . to have occurred during the performance of his duties and *within the scope of his employment, the public entity shall be liable for the reasonable costs of the defense* and reasonable attorney fees of its public employee *unless* . . . [i]t is determined by a court that the injuries *did not arise out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment . . . . If it is so determined, the public entity may request and the court shall order such employee to reimburse the public entity . . . .*

Colo. Rev. Stat. § 24-10-110 (emphasis added). The Governmental Immunity Act thus requires a public employer to provide defense costs for all police officers unless the fact finder determines he or she was acting outside the scope of duty when the injury creating the liability occurred, in which event the officer is required to reimburse the costs upon request.

The Peace Officer's Act provides, in relevant part:

> Notwithstanding the doctrine[] of sovereign immunity, . . . *It is the duty of the city, town, county, city and county, or other political subdivision to provide the defense . . . for any such peace officer in [a] claim or civil action.* However, in the event that the court determines that a peace officer, level IIIa, incurred such liability while acting outside the scope of his assigned duties or that such peace officer, level IIIa, acted in a willful and wanton manner in incurring such liability, *the court shall order such peace officer, level IIIa, to reimburse the political subdivision for reasonable costs and reasonable attorney fees expended for the defense of such peace officer, level IIIa.*

Colo. Rev. Stat. § 29-5-111 (emphasis added). The Peace Officers Act thus draws a distinction between level IIIa police officers and all other officers. Level IIIa officers are reserve officers with authority to enforce the law only while actually on duty and acting within the scope of their authority. *See* Colo. Rev. Stat. § 18-1-901(1)(IV.5). They serve without compensation and are treated differently in many respects from paid officers. The Peace Officer's Act requires Denver to provide a defense for all police officers, but clearly requires only level IIIa officers to reimburse Denver if the court finds they incurred the liability while acting outside the scope of their assigned duties. In other words, there is no reimbursement provision for level I or other paid officers. All parties agree that at all relevant times officer Gray was a paid level I officer.

The two statutes are thus in conflict regarding the reimbursement of defense costs for level I officers: The Governmental Immunity Act requires all officers to reimburse Denver if they are found to have acted outside the scope of their employment; the Peace Officer's Act requires only level IIIa officers to

-27-

reimburse Denver if they are found to have acted outside the scope of their employment. The district court acknowledged this difference between the two statutes in its pretrial Memorandum and Order dated September 23, 1996, stating "under the Peace Officer's Act, even if Gray's action were found to be outside the scope of his duties . . . Denver would be unable to recoup the costs of defending him." App., vol. I at 211. Without explanation, the district court's later ruling on the reimbursement issue relied solely on the Governmental Immunity Act and made no mention of the Peace Officer's Act. The correct disposition of this issue requires us to first decide which statute to apply.

Colorado decisional law establishes that the Governmental Immunity Act and the Peace Officer's Act are independent of each other and meant to be read separately. In *Antonopoulos v. Town of Telluride*, 532 P.2d 346 (Colo. 1975), the Colorado Supreme Court held that a claim against police officers pursuant to the Peace Officer's Act was not limited by a conflicting requirement in the Governmental Immunity Act. The court made clear that "[t]he secondary liability of a governmental entity . . . [under the Peace Officer's Act] is different and distinct from the direct liability imposed by the [Governmental] Immunity Act." *Id.* at 397.

Moreover, fundamental rules of statutory construction require the court to apply the Peace Officer's Act in this situation. It is well settled that, in the event

-28-

of apparent statutory conflict, specific language overrides general language. *See Morales v. Trans World Airlines Inc.*, 504 U.S. 374, 384-85 (1992); *Gorman v. Tucker*, 961 P.2d 1126, 1129 (Colo. 1998). The Governmental Immunity Act pertains to governmental employees generally, while the Peace Officer's Act defines the rights of police officers specifically. Therefore, in light of the conflict between the two statutes, the Peace Officer's Act takes precedence.

We see no reason, and Denver offers none, why *Antonopoulous* and the settled principles of statutory construction should not control here. We hold that the Peace Officer's Act applies to Officer Gray's assigned cross-claim for defense costs. Pursuant to the language of this statute, the reimbursement provision does not apply to Officer Gray, regardless of any finding regarding the "scope of employment." Accordingly, the district court erred by relying on the Governmental Immunity Act to deny Mr. Brown's motion on the ground that the reimbursement provision applied to Officer Gray because the jury found he acted outside the scope of his employment.

Denver asserts that, in any event, Mr. Brown is not entitled to recover on Officer Gray's claim for defense costs, raising several arguments.

### 1. *Assignability of Claim*

Denver argues the assignment of Officer Gray's cross-claim for defense costs to Mr. Brown was improper under Colorado law and violated Colorado's public policy.   We disagree.

Colorado generally favors the assignment of rights pursuant to a valid contractual arrangement.  *See Arvada Hardwood Floor Co. v. James*, 638 P.2d 828, 830 (Colo. App. 1981).  Colorado law also favors transfer of rights of action. *See Parrish Chiropractic Ctrs., P.C. v. Progressive Casualty Ins. Co.,* 874 P.2d 1049, 1053 (Colo. 1994).  Causes of action which survive the death of the party entitled to sue may ordinarily be assigned, *see Olmstead v. Allstate Ins. Co.*, 320 F. Supp. 1076, 1077 (D. Colo. 1971) (applying Colorado law), and under Colorado law all causes of action survive death except slander and libel, *see* Colo. Rev. Stat. § 13-20-101 (1987).  The only assignments Colorado does not allow are for claims involving matters of personal trust or confidence or for personal services.  *See Matson v. White*, 220 P.2d 864, 866 (Colo. 1950) (noting exception and upholding assignment of claim for specific performance); *Scott v. Fox Bros. Ent., Inc.*, 667 P.2d 773 (Colo. App. 1983) (holding real estate option contract to be assignable so long as optioner did not rely on personal integrity, credit, or responsibility of original optionee).

-30-

Denver relies heavily on *Roberts v. Holland & Hart*, 857 P.2d 492, 495 (Colo. App. 1993), which held that public policy discourages the assignment of legal malpractice claims. The *Roberts* court reasoned that legal malpractice claims involve matters of personal trust and personal service, and permitting the transfer of such claims would undermine the important relationship between an attorney and client. The court was persuaded, in part, by the reasoning in *Goodley v. Wank & Wank, Inc.*, 62 Cal.App.3d 389 (1976):

> The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders . . . who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. . . . The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Roberts*, 857 P.2d at 495-96 (quoting *Goodley*, 62 Cal. App.3d at 397). These are valid concerns. However, the assignment of defense costs presents an entirely different situation that does not implicate these issues.

Where the assignment involves the costs of defense, an amount which has already been determined for a service which is not the subject of dispute, the deleterious effects warned of in *Roberts* do not occur. Assignment in this circumstance does not encourage unjustified suits or force attorneys to defend

-31-

themselves against casual purchases of causes of actions. The sanctity of the attorney-client relationship is not invaded and the assignment does not foster the establishment of a general market for such claims.

A claim for costs of defense is akin to the sort of fee-shifting arrangements courts oversee every day. It is not a claim for the specific performance of personal services. Nor does it involve matters of personal trust and confidence. In light of these arguments, *Roberts'* inapplicability, and Colorado's preference for assignability of claims, we conclude the assignment of Officer Gray's cross-claim for defense costs to Mr. Brown was proper. *Cf. Baker v. Young*, 798 P.2d 889 (Colo. 1990) (holding that an insurer's obligation to defend an insured was a property interest subject to pre-judgment attachment).

### 2. *Colorado Constitution*

Denver next claims that requiring it to pay the costs of Officer Gray's defense conflicts with its City Charter and therefore violates the Colorado Constitution. Again, we disagree.

Under Colorado law, an ordinance of a home rule city (such as Denver) supersedes a conflicting state statute if the subject matter is of purely local concern. *See* Colo. Const., art. XX, § 6;[11] *Conrad v. City of Thornton*, 553 P.2d

---

[11]Colorado Constitution, art. XX, section 6 states in relevant part:
Home rule for cities and towns. The people of each city or town of this state, having a population of two thousand inhabitants as determined by the last
(continued...)

822, 825 (Colo. 1976). In matters of mixed state and local concern, the state statute trumps conflicting provisions of a city ordinance. *See City & County of Denver v. State*, 788 P.2d 764, 767 (Colo. 1990). Denver argues that defense costs for police officers constitute employee benefits which are matters of purely local concern. Thus, Denver reasons, any state provision requiring cities to provide this "benefit" to employees who were acting outside the scope of their employment conflicts with Denver's Charter, which only allows the City Attorney's Office to represent municipal employees in cases involving actions taken within the scope of their employment.

The most obvious weak point in this argument is Denver's characterization of defense costs as employee benefits. Denver's apparent motivation in making this definitional leap is to bring itself within the ambit of two Colorado cases. *Colorado Springs Fire Fighters Ass'n v. Colorado Springs*, 784 P.2d 766 (Colo. 1989), recognized that the authority to define the scope of employee compensation, including health benefits, is of particular concern to local

---

[11](...continued)
preceding census taken under the authority of the United States, the state of Colorado or said city or town, are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters.

Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

government.  *See id.* at 773 & n.18.  In light of this ruling, *Schaefer v. City & County of Denver*, 973 P.2d 717 (Colo. App. 1998), held that where a local ordinance conflicted with state law regarding employee health benefits, the ordinance controlled.  *See id.* at 721.  We are saved from having to determine whether Denver's classification of defense costs as employee benefits makes sense by the fact that the Colorado courts have already spoken.  In *DeLong v. City & County of Denver*, 576 P.2d 537, 540 (Colo. 1978), the state supreme court found that "governmental immunity for tortious acts of municipal police officers is a matter of both statewide and local concern."  *See also Frick v. Abell*, 602 P.2d 852, 855 (Colo. 1979) (same re. indemnification of municipal police officers).  It is clear from these pronouncements that municipal liability for the acts of police officers is a matter of concurrent state and local interest in Colorado.  The state law providing for defense costs to police officers for defending against tort actions is much more analogous to indemnification for liability from tort actions since both are provided for in the same subsection of the Peace Officer's Act, than is Denver's provision of employee benefits.  Therefore, the state statute controls to the extent there is a conflict, and Colorado's Constitution is not offended.

Moreover, it is not clear that Denver's Charter and the Peace Officer's Act actually conflict.  The Denver Charter limits the *City Attorney's Office* to

providing representation to employees in cases involving torts committed within the scope of their employment. *See* Charter, Ch. A, art. X, A10.1-1. It makes no reference to the City's obligation to provide costs if the defense is undertaken by other counsel. The Peace Officer's Act requires the public entity *either* to provide a defense through its own legal staff *or* to pay the costs incurred "by other counsel." Colo. Rev. Stat. § 29-5-111(1). Denver refused to provide Officer Gray with representation by the City Attorney's Office even before a determination was made whether he was acting in the scope of his employment, and therefore Officer Gray had to retain outside counsel. Denver's Charter does not address this situation, and therefore it does not appear to conflict with the state statute. Moreover, another part of the Charter, which sets out the "Rights and Liabilities" of the City Attorney's Office, expressly incorporates the Peace Officer's Act. *See* Charter, Ch. A, art. X, A10.8. Consequently, we do not find a conflict between the charter and the statute.

In sum, whether a municipality provides its police officers with defense costs against tort actions is a matter of both state and local concern. Therefore to the extent, if any, that the charter conflicts with state law, the Peace Officer's Act supersedes Denver's charter.

### 3. *Governmental Immunity*

-35-

Denver finally argues that the Governmental Immunity Act shields it from Officer Gray's cross-claim. This argument might have merit but for the first six words of the Peace Officer's Act: "Notwithstanding the doctrines of sovereign immunity . . . ." Colo. Rev. Stat. § 29-5-111. This clause clearly operates as a waiver of immunity. As discussed above, the rights and duties created by the Peace Officer's Act are independent of and not limited by the Governmental Immunity Act. *See Antonopoulos*, 532 P.2d at 349. The Peace Officer's Act properly applies to Officer Gray's assigned cross-claim. Therefore, the City is not immune.

**B. Out-of-Pocket Expenses**

Mr. Brown finally contends the trial court erred by refusing to award certain out-of-pocket expenses, amounting to approximately $22,792.65, as part of the attorney's fees he received pursuant to 42 U.S.C. § 1988. We review the reasonableness of an award of attorney's fees for abuse of discretion, giving great weight to the district court's assessment. *See Sussman v. Patterson*, 108 F.3d 1206, 1209 (10th Cir. 1997) (citing *Zuchel*, 997 F.2d at 743). However, we review the district court's statutory interpretation or legal analysis of the basis for the award de novo. *See id.* (citing *Beard v. Teska*, 31 F.3d 942, 955 (10th Cir. 1994)).

There are two separate sources of authority courts use to award out-of-pocket expenses to a prevailing party. Some expenses, such as travel, may be included in the concept of attorney's fees as "incidental and necessary expenses incurred in furnishing effective and competent representation." 122 Cong. Rec. H12160 (daily ed. Oct. 1, 1976) (statement of Rep. Drinan). These expenses are thus authorized by section 1988. *See Dowdell v. City of Apopka,* 698 F.2d 1181, 1190 (11th Cir. 1983) ("Reasonable attorneys' fees under [section 1988] must include reasonable expenses because attorneys' fees and expenses are inseparably intertwined as equally vital components of the costs of litigation."). Other costs, such as interpreters' fees and stenographic fees, are incurred by third parties who are not attorneys for the case. These costs cannot reasonably be considered attorney's fees, and are instead governed by 28 U.S.C. § 1920, the general costs statute.

We set forth the guidelines for awarding out-of-pocket expenses pursuant to section 1988 in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir. 1983). We held there that "[i]tems that are normally itemized and billed in addition to the hourly rate should be included in fee allowances in civil rights cases if reasonable in amount." *Id.* at 559; *see also Sussman*, 108 F.3d at 1213. In other words, reasonable out-of-pocket expenses not normally absorbed as part of law firm overhead should be reimbursed as attorney's fees under section 1988. In deciding

whether to award such expenses, the district court must determine whether "such expenses are usually charged separately in the area." *Sussman*, 108 F.3d at 1213. This necessarily involves a factual inquiry into the billing practices of law firms in the region who provide services to fee-paying clients.

In this case, Mr. Brown's attorneys first submitted a request to the district court for a taxation of costs for various items pursuant to section 1920, and the court taxed $1,000.90 of these costs to Denver. *See* App., vol. II at 296. The attorneys then filed an application for attorney's fees, requesting that the expenses not recoverable as costs under section 1920 be awarded as fees pursuant to section 1988. The attorneys stated that these remaining items all represented costs that are ordinarily billed to clients.

The district court denied this request with little explanation and without undertaking the type of inquiry described in *Ramos*. Instead, the court stated, "Brown filed no motion to review [the taxation of costs pursuant to section 1920], nor does he provide authority for awarding costs not accounted for in that award." *Id.* at 380. This response, combined with the court's lack of analysis of section 1988, convinces us the court either confused the two cost statutes or failed to appreciate the fact that Mr. Brown's attorneys were requesting reimbursement of the expenses as part of their *attorney's fee* award pursuant to section 1988. As such, the court's refusal to award these expenses cannot be viewed as an exercise

of its discretion, but rather as the result of a legal error. A remand is appropriate so the court may determine whether the expenses at issue should be awarded as attorney's fees under section 1988. Because the expenses incurred by Mr. Brown's attorneys are of a type that might be separately itemized and billed, the court on remand should determine specifically whether such expenses are normally billed to a private client in the local area and, if so, evaluate the reasonableness of the amount. *See Bee v. Greaves*, 910 F.2d 686, 690 (10th Cir. 1990).

## IV

To summarize, the district court properly denied Denver's motion for judgment as a matter of law based on allegedly insufficient evidence and its motion for a new trial based on an allegedly improper jury instruction. However, the court erred as a matter of law in denying Mr. Brown's motion on the assigned cross-claim for defense costs because it failed to apply the correct Colorado statute. Finally, the court should have determined whether the out-of-pocket expenses Mr. Brown's attorney requested were properly includable as attorney's fees pursuant to 42 U.S.C. § 1988.

Accordingly, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.