Carroll LEWIS, Jr., Plaintiff,

v.

**BOARD OF SEDGWICK COUNTY COMMISSIONERS,**
Defendant.

Civil Action No. 97–1483–WEB.

United States District Court,
D. Kansas.

April 25, 2001.

Michael K. Lehr, Wichita, KS, for plaintiff.

Alan L. Rupe, S. Douglas MacKay, Kelly J. Johnson, Husch & Eppenberger, LLC, Wichita, KS, for defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

In this action under 42 U.S.C. § 1983, plaintiff alleged that Sedgwick County detention officers at the County's Adult Detention Facility violated his constitutional rights by using excessive force against him while he was in custody at the facility. Plaintiff initially named as defendants the individual officers involved in the incident and the Board of Sedgwick County Commissioners. The claims against the individual officers were dropped, however, leaving only the claim against Sedgwick County. *See* Pretrial Order, Doc. 81 at 2–3. Plaintiff argued the county was liable for the alleged violation because it had a "custom and policy of failing to adequately train, supervise or discipline Sedgwick County Sheriff Detention Deputies" regarding the use of excessive force. *Id.* at 5. This claim was tried to a jury between January 9–18, 2001. The defendant moved for judgment as a matter of law at the close of plaintiff's case and again after all the evidence was submitted. Although the court informed counsel it had serious doubts whether plaintiff's evidence was legally sufficient to support a claim, the court took the motions under advisement and submitted the claim to the jury. On January 18th, the jury returned a verdict for plaintiff in the amount of $500,000. After the verdict was returned, defendant renewed its motion for judgment as a matter of law and also filed a motion for new trial. These motions are now before the court. For the reasons set forth herein, the court concludes that defendant's motion for judgment as a matter of law must be granted.

### I. Background.

In November of 1996, plaintiff Carroll Lewis was approximately twenty years old and was a member of the United States Air Force stationed at McConnell Air Force Base near Wichita. His primary job was as a boom operator on a KC–135 refueling tanker, which was a fairly rigorous job. Late in the evening hours of November 3, 1996, plaintiff was involved in an incident at his girlfriend's house in which he kicked in the door of the house. Plaintiff was arrested by Wichita police officers on suspicion of criminal damage to property and domestic violence. Plaintiff was cooperative when he was arrested and went along without resistance. He was booked into the Sedgwick County Adult Detention Facility sometime around midnight, and was placed in a holding cell with approximately 15–25 other individuals. Shortly thereafter, he was taken for fingerprinting and was allowed to use a phone. Plaintiff called a bail bondsman and found out a bond would require $100 down, which plaintiff did not have. Plaintiff testified that one of the deputies on duty that night told him he would be released in 7–9 hours. According to plaintiff, a deputy also told him if he needed anything he should tap on the glass window of the holding cell door and wave. Plaintiff was placed back in the holding cell and tried to go to sleep.

According to plaintiff's testimony, at around 7 o'clock a.m. ((November 4th), shortly after breakfast), he tapped on the glass of the holding cell door. He said a detention deputy looked up at him but then went back to work, so plaintiff tapped on the glass again, this time somewhat louder. The deputy, Chris Wright, came over and opened the door. According to plaintiff, he asked Wright how much longer he was going to be held, to which Wright replied he did not know. Plaintiff told Wright he had been there seven or eight hours, at which point Wright began to close the cell door. According to plaintiff, he again asked Wright when he was going to get out, and Wright then directed him to step out of the cell. Plaintiff testified Wright and another officer walked him over the to the booking desk, found out he was in on a domestic violence charge, and then took him to an open "isolation cell" near the desk and directed him to get in the cell and take off his shoes and jacket. Plaintiff testified he went into the cell and was taking off his jacket when another deputy who was there, David Spears, said something to the effect of "He can do it faster than that" and grabbed plaintiff's arm and began twisting it. According to plaintiff, several other deputies then ran into the cell, grabbed him, threw him down, took hold of his neck and began choking him. He said they slammed his shoulder into the concrete floor and began delivering blows. Plaintiff said he gave the officers no resistance but they continued to strike him. He testified they pulled on his arms, hit him, pulled on his neck, stood on his back, lifted him up by the handcuffs, and eventually placed him into a restraint chair that had been brought into the cell. Plaintiff testified the deputies continued to hit him after they placed him in the restraint chair and subsequently taunted him while he was in the chair. Plaintiff was kept in the chair for a little over an hour, until officers from the Air Force base arrived and ordered him to cooperate with the jail staff. He was released from custody a short time later after making a first appearance before a judge. The detention officers' version of what happened that morning, in brief, was that plaintiff was banging on the door of the holding cell, yelling and creating a disturbance in the presence of numerous other detainees, so Deputy Wright decided to move him to an isolation cell. According to the deputies, when plaintiff reached the isolation cell he became combative and took a defiant stance, challenging the deputies to "put him in there," and telling the officers to "take them" when they told him to remove his shoes and jacket. Sergeant Plant, who was backing up Deputy Wright, testified he told plaintiff to "cuff up" at that point and attempted to handcuff plaintiff, but plaintiff resisted when the deputies took hold of his arms. The officers testified that a struggle of 2–3 minutes ensued in which numerous deputies joined in an effort to get control of plaintiff and to get him handcuffed. The officers testified the group fell or was forced to the floor during the struggle. Several deputies used "pressure point" techniques involving blows or holds to various nerve points on plaintiff's body in an attempt to overcome his resistance. They testified plaintiff was exceptionally strong and they had difficulty getting control of him. Sergeant Plant said at one point he put his foot in plaintiff's back and forced him back down to the floor because plaintiff was able to get up off the floor as the officers were trying to get control of him. The officers eventually got plaintiff handcuffed and, according to their testimony, put him in the restraint chair due to his continued violent resistance where he was kept until he eventually calmed down.

One of the deputies testified that she obtained one of the jail's video cameras when the disturbance began and attempt-

ed to film it. As it turned out, however, the incident was not recorded on the videotape, although subsequent periodic observations of plaintiff in the restraint chair were recorded. The deputy could not really explain this, except to say she later heard that this particular camera sometimes malfunctioned. The defense also suggested that the deputy may have misunderstood how the camera operated. At trial the parties stipulated to the introduction of an expert's opinion that the videotape had not been altered in any way.

Plaintiff testified that after he was released from the jail he had pain in his back, neck, wrists and hands. He sought treatment at the Air Force Base on November 5, 1996. He was placed on "DNIF" (duties not to include flying) status for a week and a half. He subsequently returned to flying duty, but said he continued to suffer back pain in the ensuing months and it gradually became worse. He testified he saw numerous doctors over the next year and a half, but his condition did not improve and he said it eventually led to him being unable to perform his job. Plaintiff testified he never had back pain prior to the incident at the jail and he attributed his ongoing pain and disability to the incident on November 4, 1996.

Plaintiff produced no medical testimony regarding his injuries. Some of his Air Force records, including records of his medical treatment, were admitted into evidence. *See* Pl. Exh. 107. Although the records were by no means self-explanatory, they indicated that on November 5, 1996, plaintiff's injuries were diagnosed as being relatively minor, consisting primarily of temporary strains, soreness and bruises. Plaintiff sought treatment again on November 7, 1996, complaining of back pain, and was prescribed pain medication and a muscle relaxant. He was returned to fly-

ing status on November 14, 1996. Except for certain periods relating to various other ailments, plaintiff was basically able to perform his flying duties throughout most of the following year, although he apparently continued to periodically take medication for his back and other problems. In December of 1997, plaintiff complained of back pain and spasms and was given medication and was directed to do stretching exercises. He was placed on DNIF status and referred for X-rays to determine if he had sustained a compression fracture. An X-ray in December of 1997 revealed no evidence of fracture or encroachment upon the spinal canal, although it did show diffuse "degenerative thoracic spine changes" that were somewhat advanced for plaintiff's age. Plaintiff continued to seek treatment for his back and had an MRI in February of 1998. That MRI showed no acute abnormality, although it indicated a "mild exaggeration of a normal kyphosis of the thoracic spine." Plaintiff was referred to a specialist in March of 1998, who indicated plaintiff had changes in his spine consistent with "Scheuermann's disease," which he described as a juvenile spinal problem involving a curvature of the spine and amenable to corrective therapy only in a patient's teen years. The doctor noted that this diagnosis could not be confirmed without additional information. He also noted other possibilities, including that the degenerative spinal changes could be post-traumatic.[1] Another MRI, performed in April of 1998, showed no apparent anomalies in plaintiff's thoracic cord and no changes since the February MRI. A subsequent examination by an orthopaedic specialist in April of 1998 indicated "some wedging of T7, T8 and T9," but "no marrow changes in T7–T8 or T8–T9 although there are some end plate changes, which

---

**1.** The patient history section of the medical reports indicate that plaintiff attributed his back pain to the altercation at the jail in November of 1996.

would be more consistent with Sherman's [sic] kyphosis, and would not be an indication of a traumatic injury." In May of 1998, plaintiff was examined by another specialist, who also reported findings consistent with Scheuermann's disease. Another MRI in June of 1998 indicated some disc protrusion and bulging in plaintiff's lower back, but according to the doctor's report there was no significant narrowing of the nerve openings or spinal canal. All sorts of conventional treatments were tried in an effort to alleviate plaintiff's back pain, but they were largely unsuccessful. In November of 1998, approximately two years after the incident at the jail, plaintiff's commanding officer recommended that plaintiff be discharged from the Air Force because he was no longer able to perform his job or any other job in the squadron. Plaintiff was eventually discharged from the service with disability pay.[2]

At trial, counsel for plaintiff questioned several of the detention officers involved in the incident about their training concerning the use of force and whether their actions complied with the jail's policies on the use of force. The evidence relating to the officers' training will be discussed in more detail infra. Evidence was also presented that plaintiff filed a complaint against the officers with the Sedgwick County Sheriff's Office, and plaintiff's counsel questioned the officer in charge of that investigation about his review of the complaint as well as his investigation of prior complaints of excessive force at the jail.

## II. *Defendant's Motion for Judgment as a Matter of Law.*

Defendant seeks judgment as a matter of law, arguing plaintiff failed to produce evidence to support all the necessary elements of a claim under § 1983. Although defendant concedes for purposes of its motion that a reasonable jury could find that the officers used excessive force, it argues plaintiff failed to produce evidence showing the county's program for training, supervising, or disciplining detention officers was inadequate, that the county was deliberately indifferent to the rights of persons with whom its officers come into contact, or that a county policy or custom caused the deprivation of plaintiff's rights.

■■■ Judgment as a matter of law is appropriate only "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed.R.Civ.P. 50(a)(1); *see also Davis v. United States Postal Serv.,* 142 F.3d 1334, 1339 (10th Cir.1998) ("[A] court may grant the motion only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position."). In considering such a motion, the court must construe the evidence and inferences therefrom in a light most favorable to the nonmoving party. *See Wilson v. Tulsa Junior College,* 164 F.3d 534, 536 (10th Cir.1998). Such a motion must be granted, however, if there is no legally sufficient evidentiary basis to support all

---

2. A disability rating decision of the Department of Veteran's Affairs was included in the exhibits. Pl. Exh. 107. It stated, among other things, that Scheuermann's disease is "a relatively common condition in which backache and kyphosis are associated with localized changes in the vertebral bodies." (Citing MERCK Manual, 16th Ed., p. 2261). It further stated, "Per MERCK, trauma can some-

times be a causative factor. Service medical records show the veteran claims to have been beaten by civilian law enforcement personnel during a period of temporary confinement. Also, he was in a motor vehicle accident while in service. Either traumatic episode could have caused the onset of Scheuermann's Disease."

of the essential elements of a claim under the governing law.

A. *County Liability under Section 1983.*

 Section 1983 authorizes the recovery of damages against any person acting under color of state law who deprives an individual of a constitutional right. *See* 42 U.S.C. § 1983. As such, it would permit a plaintiff to recover damages against individual detention officers who knowingly violate a plaintiff's constitutional rights through the willful use of excessive force.[3] In this case, plaintiff has not sought damages from the officers; he has pursued a claim only against Sedgwick County. The law is clear that a county may not be held liable under § 1983 merely by virtue of the fact that it employed officers who violated a person's constitutional rights. *See City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A county can be liable only where the county itself caused the violation. *Id.* This requires a showing of a direct causal link between a county policy or custom and the constitutional violation itself. *Id.* The failure of a county to adequately train, supervise or discipline its detention officers regarding the use of excessive force—such as was alleged here by plaintiff—may qualify as a county "custom" or "policy" only where a showing is made that the county's program is inadequate in such a manner that evinces a "deliberate indifference" on the part of the county's policymaker to the constitutional rights of persons with whom the officers come into contact. *Id.* at 388, 109 S.Ct. 1197.

 In sum, then, to establish a county's liability under § 1983 for excessive force caused by inadequate training, supervision or discipline of detention officers, the plaintiff must show the following essential elements: (1) that the officers exceeded constitutional limitations on the use of force; (2) that the use of force arose under circumstances that constitute a usual and recurring situation with which detention officers must deal; (3) that the county's inadequate training, supervision or discipline demonstrated a deliberate indifference on the part of the county toward persons with whom the detention officers come into contact, and (4) that there is a direct causal link between the constitutional deprivation and the inadequate training, supervision or discipline. *See Allen v. Muskogee, Okla.,* 119 F.3d 837, 841–42 (10th Cir.1997) (*citing Zuchel v. City and County of Denver,* 997 F.2d 730, 734–35 (10th Cir.1993)).

 The evidence presented at trial would permit a reasonable jury to find that plaintiff proved the first two essential elements of his claim, including that the officers violated his rights by using excessive force. Although the guards testified they only used force in response to plaintiff's physical resistance and used the minimum force necessary under the circumstances, a reasonable jury could find, based on plaintiff's testimony, that the guards engaged in an unprovoked assault and used force well in excess of what was necessary. It was up to the jury to resolve this conflict in the testimony based on its assessment of the credibility of the witnesses. In this regard, the court notes that more than one of the officers who testified in this case exhibited a quick temper on the stand or an attitude that the jury could reasonably view (and apparently did) as an arrogant

---

**3.** The Supreme Court has not yet clarified whether constitutional limitations on the use of force against pre-trial detainees are determined with reference to the "reasonableness" standard of the Fourth Amendment, the "cruel and unusual punishment" standard of the Eighth Amendment, or some other standard. The court's instructions to the jury in the instant case essentially adopted the reasonableness standard of the Fourth Amendment.

dismissal of any questioning of the officers' competence or good faith. This demeanor may explain in part the jury's verdict. Be that as it may, the improper actions of the detention officers, standing alone, are not sufficient to support a claim against the county under the facts of this case.

In *Canton v. Harris, supra,* the Supreme Court made clear that a relatively high degree of fault (i.e. deliberate indifference) on the part of a county is required in failure-to-train claims because counties would otherwise be subjected "to unprecedented liability under § 1983" and "de facto respondeat superior liability," something the Supreme Court has rejected. *Canton,* 489 U.S. at 391–92, 109 S.Ct. 1197. This high degree of fault may be found where, in light of the duties assigned to specific officers, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 111 S.Ct. 818. In outlining the "deliberate indifference" necessary to support a claim, the Supreme Court offered by way of example the fact that city policymakers know to a certainty police officers must arrest fleeing felons, and police are given firearms to assist them in this task. "Thus, the need to train officers in the constitutional·limitations on the use of deadly force [ ] can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference to constitutional rights.'" *Id.* at 390, n. 10, 111 S.Ct. 818. Similarly, "[i]t

could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Id.*

The evidence presented in this case showed without question that Sedgwick County's program for training detention officers included instruction in the basic constitutional limitations on the use of force and the prohibition against using excessive and unreasonable force. There is no dispute that in its academy training the county consistently provided a course on the use of force and the legal liability arising from the use of unreasonable force. The uncontroverted testimony of the witnesses was that appropriate limitations on the use of force were frequently discussed in other training classes as well. The uncontroverted testimony of the officers also established that they understood from their training—both in the academy and on-the-job—that the use of excessive force against a cooperating, nonresistive detainee was prohibited, and that such conduct could subject officers to civil and criminal liability as well as disciplinary action.[4] The uncontroverted testimony of the officers made clear they were informed regarding General Order No. 105.08, issued by Sheriff Mike Hill in February of 1995,[5] which represented the county's written policy regarding the use of force in the detention facility. Among other things, that policy provided:

4. Plaintiff contends "Sgt. Nunnelly [sic] testified that he believed he was trained that he could use whatever force was necessary to restrain a person who needed to be restrained. Sgt. Nunnelly's testimony in this regard indicates he did not believe his actions as a first-line supervisor and detention deputy had to comply with any standards whatsoever." Doc. 163 at 6. The testimony of this

witness, including his references to the force that was "necessary" on persons who "needed to be restrained," simply will not support an assertion that the officer believed there were no constraints on the use of force.

5. According to the testimony, this policy replaced a similar policy that was in effect prior to February of 1995.

I. General Provisions:

A. To reduce the possibility of serious injury to staff and inmates, only the minimal amount of force necessary shall be used to control an inmate or situation in the facility. Security equipment used to restrain inmates can cause injury when used improperly. To prevent this possibility only the restraining equipment necessary to bring the inmate safely under control while protecting the safety of the staff and the security of the facility shall be used.

B. Force will only be used:

1. In self defense

2. To prevent escape

3. To prevent injury to a person or to property

4. To quell a disturbance

5. When an inmate exercises physical resistance to a lawful command

6. When other attempts at resolving an issue or incident have been exhausted (i.e., as a final request).

C. The use of restraints shall be used only as a last resort to control an inmate's behavior and shall not be applied as a form of punishment or to control seizure seizures brought on by a medical condition. In a restraint situation only that amount of force necessary to control and contain the inmate shall be authorized. Departmental policy will be reviewed and followed as the primary policy for the application of force.

II. Physical Handling

A. The use of physical force should be progressive unless reasonable alternatives have been exhausted or are reasonably believed to be ineffective. Physical handling is justified only as much as is reasonable and necessary to gain control of the inmate/situation.

B. Force shall not, under any circumstances, be used for the purposes of punishment or discipline.

\* \* \* \* \* \*

III. Restraint Equipment

A. The use of restraints to control behavior inside the facility shall be authorized only by a Detention Supervisor.

\* \* \* \* \* \*

B. The criterion used as a determinant for the application of restraints shall include behavior that:

1. Is violent and self destructive, placing the inmate in immediate danger of physical injury or harm.

2. The inmate constitutes an immediate danger of causing physical injury to other inmates or Detention staff.

C. Restraints shall be removed as soon as a Detention Supervisor is able to determine that the inmate's behavior is able to be controlled without the use of restraints.

D. In situations where force has been used, medical personnel shall examine the inmate(s) to determine the nature and extent of any injuries and provide the appropriate treatment.

Def. Exh. D–7. The officers testified they were further trained concerning the "one plus one" theory, pursuant to which they were taught they could use the same level of force used by a resistive inmate and, if necessary, one additional "level" to overcome the inmate's resistance.

If, as the jury apparently believed, the detention officers did what plaintiff claimed—i.e., assaulted him and repeatedly struck him without justification or necessity and without any resistance on his part—it cannot be said that they did so as a result of inadequate training by the county. Such conduct would have been a clear violation of the county's policies and

the training the officers received concerning the use of force. The evidence unquestionably showed that Sedgwick County provided its detention officers training concerning the relevant constitutional limitations on the use of force as applied to the officers' duties. Nothing was presented to show that Sedgwick County had a policy or custom that caused such a use of excessive force. No evidence was presented that Sedgwick County's program for training, supervising or disciplining deputies was inadequate as compared to any recognized or accepted law enforcement standards. No witness with knowledge in law enforcement or constitutional standards identified or explained how this incident could be viewed as a predictable result of a county custom or policy. No evidence was presented that Sedgwick County detention officers had previously violated detainees' constitutional rights in such a manner that the need for further training in the use of force must have been obvious to the county's policymaker. *Cf. Canton, supra.* No evidence whatsoever of any prior pattern of excessive force was presented. Nor was a "glaring omission" in the county's training program identified from which it could reasonably be said that the use of excessive force against the plaintiff was a highly predictable consequence of the omission. *Cf. Canton v. Harris, supra* (a failure to train on the use of deadly force would constitute evidence of deliberate indifference).

In *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Supreme Court reiterated its previous admonition that inadequate training can be the basis for § 1983 liability only in "limited circumstances." *Id.* at 407, 117 S.Ct. 1382. Such claims require more than a showing that a county failed to do something it reasonably could or should have done: "A showing of simple or even heightened negligence will not suf-

fice." *Id.* The Court indicated that the relatively high standards of fault and causation in these cases often require proof of a pattern of constitutional violations that have put the municipality on notice its program is inadequate:

> If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequence of their action—the "deliberate indifference"—necessary to trigger municipal liability. [citations omitted].

*Id.* As was noted above, no evidence was presented here of a pattern of constitutional violations that put Sedgwick County on notice a new program was called for concerning the use of force. Instead, plaintiff appeared to rely primarily on the circumstances of this incident to suggest that the training of the officers must have been inadequate or the incident would not have happened. But proof "that a plaintiff has suffered a deprivation of federal rights at the hands of a [county] employee will not alone permit an inference of [county] culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably." *Bryan County Commissioners,* 520 U.S. at 406–07, 117 S.Ct. 1382 (emphasis in original). And while it is possible to base county liability upon a single violation of federal rights, that is permissible only "in a narrow range of circumstances" where the need for further training is so obvious that the county's policymaker can reasonably be said to have been deliberately indifferent, such as where an obvious omission in a training program makes the violation of the plaintiff's rights a "highly predictable consequence" of the county's failure. *Id.* at

409–10, 117 S.Ct. 1382. As noted above, plaintiff produced no evidence of a "glaring omission" in Sedgwick County's program that made the use of excessive force against him a highly predictable consequence. *Cf. id. See also Allen v. Muskogee, Oklahoma,* 119 F.3d 837, 842–43 (10th Cir.1997) (expert on police tactics and procedures testified that the city's training concerning handling of mentally ill individuals was contrary to police department training throughout the United States and that it caused the violation of plaintiff's rights).

### B. *Summary of Plaintiff's Arguments.*

▉▉▉▉ Plaintiff argues the county's liability is supported by various evidence introduced at trial. *See* Doc. 163. For example, he contends the inadequacy of the officers' training was shown by the fact that two of the first-line supervisors involved in this incident, Sergeants Plant and Nunnelly, received no additional classroom training, beyond what all detention officers received, concerning their duties as supervisors in use of force incidents. *Id.* at 3–4. But plaintiff failed to establish what further training the supervisors should have had and how such an omission made the use of excessive force against him likely. Plaintiff also points out that neither of these supervisors was specifically told during training they were prohibited from standing on an individual's back in an effort to restrain the person. *Id.* at 4. The court cannot agree that this constitutes a "glaring omission" showing the county was deliberately indifferent. As the officers' testimony indicated, bright-line rules are difficult to draw because the reasonableness of any particular use of force is dependent upon the circumstances and must take into account the detainee's level of resistance and any threat to the officers. The officers were given appropriate training in handcuffing techniques and techniques for overcoming resistive in-

mates. They were clearly taught that force could only be used in circumstances where it was necessary, that "[p]hysical handling is justified only as much as is reasonable and necessary to gain control of the inmate," and that "only the minimal amount of force necessary shall be used to control an inmate . . . ." If, as plaintiff testified, the officers stomped or stood on his back in the absence of any resistance when there was no necessity for doing so, they did not do so as a result of inadequate training by the county; rather, they did so despite having been trained by the county that such force was prohibited. Plaintiff also contends the inadequacy of the county's training is shown by an examination of the county's training academy syllabi, which show that "out of . . . 320 hours of [academy] training, only 2 hours were spent on the specific topic of use of force liability." *Id.* at 7. As an initial matter, this assertion ignores uncontroverted testimony about other training the officers received concerning the use of force. Moreover, simply comparing the amount of time spent in class on the use of force as opposed to other topics is not by itself sufficient to establish deliberate indifference on the part of the county. In fact, the Tenth Circuit has suggested that when a plaintiff attempts to base liability upon a single instance of excessive force, as plaintiff essentially does here, expert testimony may be required to establish the inadequacy of the county's training. *See Brown v. Gray,* 227 F.3d 1278, 1287, n. 3 (10th Cir.2000). Plaintiff presented no expert testimony in this case. Next, plaintiff argues the training materials provided to the deputies about the restraint chair contain "no information addressing the prohibition on the use of excessive force against the detainee or inmate while placing them in the restraint chair" and "lack any correlation between the type of restraint and the policy to use the minimal amount of force

necessary to end a disturbance." Doc. 163 at 10. The court is not certain what specific inadequacy plaintiff is alluding to here, but notes that the county's training made clear the restraint chair was not to be used on a cooperating and nonresistant detainee. Additionally, the training materials recommended the use of "pressure point control tactics" when inmates being placed in the chair became physically violent, but cautioned such tactics should be used "with the minimal amount of force necessary to gain compliance." Pl. Exh. 22. Nothing in this evidence could support a finding of deliberate indifference on the part of the county. Plaintiff next asserts that Deputy Wright and Sergeant Plant did not negotiate or talk with him at the time of the incident to determine what he wanted, which according to plaintiff shows the training of these officers in the use of interpersonal communication skills was inadequate. Doc. 163 at 11–12. Again, no evidence of a pattern of constitutional violations relating to such conduct was presented, nor was it shown that the county's training program was inadequate by any recognized standards. The county's deliberate indifference to a need for further training in "interpersonal communication" cannot be inferred from the circumstances of this single incident.

■ Plaintiff also argues the use of excessive force against him was a result of "the unwritten policy and custom of requiring detainees and inmates who were placed in a safety cell to remove their shoes and any loose items of clothing . . . ." Doc. 163 at 18. At trial, the officers testified the jail had an unwritten policy requiring disruptive inmates to remove these items of clothing in the isolation cell in order to prevent inmates from harming themselves or harming detention officers. At trial, plaintiff argued the policy was irrational because the officers testified they were not concerned about plaintiff's harming himself, and they could have

avoided injury, at least at that time, by leaving the cell and closing the door. Regardless of what plaintiff thought of the policy, however, it was clearly related to legitimate government objectives and was not excessive. As such, it was within the lawful authority of the jailers to adopt such a policy. *Cf. Hudson v. McMillian*, 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (" '[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' "). One cannot reasonably say the existence of this lawful policy made the use of excessive force a predictable consequence. Nor can the fact that the county did not provide further training regarding this particular policy support a claim of deliberate indifference. As with plaintiff's other contentions, no evidence was presented that the county's policy—whether written or unwritten—was contrary to accepted or appropriate law enforcement practices, or that enforcement of the policy had previously led to the use of excessive force against inmates and thereby indicated a need for further training. If, as plaintiff testified, the guards assaulted him when he was complying with their order, it cannot be said that inadequate training by the county led to such a use of excessive force by the officers.

■ Plaintiff next contends a county custom or policy of inadequate supervision and discipline of detention officers was established through the testimony of Major Daniel Bardezbain, who between 1995 and 1997 had primary responsibility for conducting internal investigations of complaints of excessive force at the jail. At trial, defense counsel questioned Major Bardezbain about his investigation of plaintiff's complaint of excessive force.

Plaintiff argues that Bardezbain's testimony showed his investigation was inadequate. Even assuming it was, however, the investigation occurred after the incident on November 4th and, whatever else it might show, it cannot be considered the cause of the incident on November 4th. In the same vein, plaintiff also questioned Bardezbain about his investigation of 17 prior complaints of excessive force at the jail. Plaintiff presented evidence that on 16 of those complaints Bardezbain may have failed to comply with a county policy requiring him to notify the complainant in writing as to the results of the investigation. Plaintiff also pointed out that Bardezbain did not personally interview the officers named in these complaints to get their version of events; rather, he had the officers draw up written reports and submit them through the chain of command. Finally, plaintiff showed that Bardezbain did not sustain any of the complaints he investigated, although another investigator sustained two complaints at least in part.[6] Even considered in the light most favorable to plaintiff, this evidence cannot establish the county's deliberate indifference to the use of excessive force, nor can it sustain a finding that the county's allegedly inadequate investigative procedures caused the violation of plaintiff's rights. As an initial matter, no evidence was presented to show that relying upon written reports, as opposed to interviewing officers personally, was an inappropriate method of reviewing complaints. More importantly, no showing was made that the county's investigative practices permitted a pattern of excessive-force incidents to go uncorrected, such that it could be said to be the cause of the incident on November 4th. The court recognizes that using investigations as a "facade to cover the violent behavioral patterns of [county] officers under investigation, to protect them from disciplinary action, and thereby perpetuate a [county's] custom of acquiescing in the excessive use of force" by its officers, if shown, would support a finding of deliberate indifference. *See Beck v. City of Pittsburgh,* 89 F.3d 966, 974 (3rd Cir.1996). *See also Mettler v. Whitledge,* 165 F.3d 1197, 1205 (8th Cir.1999) (liability exists when plaintiff produces evidence of prior complaints sufficient to demonstrate that the municipality ignored police misconduct). But no evidence was presented here to show that the county failed to take disciplinary or corrective action on any prior *meritorious* claim of excessive force. *Cf. Mettler,* 165 F.3d at 1205 ("the mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force."); *Rogers v. City of Little Rock, Ark.,* 152 F.3d 790, 799 (8th Cir.1998) (there must be some showing that prior excessive force complaints had merit). At trial, plaintiff proved that prior complaints were made, but cited nothing to substantiate any of the complaints.[7] Nor can it be said that the number or character of prior complaints alone should have put the county on notice of a pattern of excessive force. *Cf. Beck,* 89 F.3d at 973 (several complaints of excessive force against a particu-

---

**6.** The evidence indicated that a total of 22 complaints of excessive force were made by detainees between 1995 and 1997, out of approximately 90,000 detainees who went through the facility. Of those complaints, 2 were sustained in part in the county's internal review. Plaintiff has not alleged or shown that the county failed to take adequate disciplinary action with regard to the two complaints that were sustained.

**7.** It might also be noted that regardless of any internal investigations by the county, any individual subjected to excessive force was free to pursue a claim in the courts, but no evidence was presented that any of these complainants (or any other individuals) obtained an excessive force judgment or settlement against a detention officer or the county.

lar officer, all similar and occurring within a short period of time, may put policymaker on notice of the officer's use of excessive force). As with claims of inadequate training, a plaintiff alleging that his injuries were caused by inadequate investigation of excessive force complaints must show something beyond mere negligence or even heightened negligence. Plaintiff must identify the type of obvious omissions from which one can reasonably infer the county policymaker's deliberate indifference to the violation of detainees' rights, and must show a direct link between that county custom and the violation of the plaintiff's rights. Plaintiff failed to make such a showing in this case. Simply showing that the county failed to follow some of its prescribed procedures and arguing that the county thereby created a permissive or lax atmosphere does not meet the standards of *City of Canton.*

### C. *Conclusion.*

The court has reviewed plaintiff's other arguments as well, but finds they cannot support findings of deliberate indifference on the part of the county or that a county policy caused the violation of plaintiff's rights. In sum, because the evidence presented at trial does not support all of the necessary elements of a § 1983 claim against Sedgwick County, the jury's verdict in favor of plaintiff must be vacated, and judgment must be entered in favor of Sedgwick County.

### III. *Defendant's Motion for New Trial or for Remittitur.*

In addition to its motion for judgment as a matter of law, defendant argues in the alternative it is entitled to a new trial or a reduction of the damages. In view of the court's ruling above that the defendant is entitled to judgment as a matter of law, the motion for new trial is, at this point, moot. If the court's ruling were to be set aside, however, the motion for new trial

would then become an issue. In order that all potential issues might be decided in one proceeding, the court will address defendant's motion for a new trial, although such a ruling will not affect the judgment to be entered.

Under the Federal Rules of Civil Procedure, a new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). Generally, this means a new trial is warranted only when a jury has reached a "seriously erroneous result" as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.,* the proceedings being influenced by prejudice or bias. *See Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940). The discretionary power to grant a new trial should not be exercised lightly. To the contrary, because it is the jury's job to resolve disputed facts, including the amount of damages suffered, a jury's determination of damages should not be disturbed if there is any legitimate basis in the evidence to support it. At the same time, when a verdict is against the weight of the evidence, the court has a duty to grant a new trial in order to prevent a miscarriage of justice. *See Duncan v. Duncan,* 377 F.2d 49, 52 (6th Cir.), *cert. denied,* 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260 (1967).

The court has examined the arguments made by defendant in support of its motion for new trial and, with one exception, finds them to be without merit. As to that exception, however, the court agrees with defendant that the jury's verdict of $500,000 is excessive and is against the

weight of the evidence produced at trial. In his closing argument, plaintiff's counsel argued to the jury that plaintiff's injuries merited an award of damages in the amount of $250,000. The jury's subsequent verdict of $500,000 leads the court to conclude that one of two impermissible factors likely influenced the jury's determination of damages: either the jury was influenced by a desire to punish the county for the conduct of its employees (as opposed to determining the damages that would fairly compensate plaintiff for his injuries), or the jury misunderstood the court's instruction regarding plaintiff's claim of a permanent back injury.

 If the jury intended by its verdict to punish the county, as an award of twice what plaintiff requested suggests, then its verdict was contrary to established law and constitutes grounds for a new trial. Municipalities, including counties, are immune from the imposition of punitive damages under § 1983. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Punitive damages by definition are not intended to compensate the injured party, but rather to punish a wrongdoer whose action was intentional and malicious. *Id.* In the case of a county, however, an imposition of punitive damages punishes only the taxpayers, who took no part in the wrongdoing. *Id.* at 267, 101 S.Ct. 2748. If this were a punitive award then the county is entitled to a new trial, at least insofar as the amount of damages is concerned.

 If the verdict of $500,000 were not punitive in nature, but rather represents the jury's determination of the amount of damages suffered by plaintiff, the court must conclude the award exceeds what the evidence will reasonably support. *See Fitzgerald v. Mountain States Tel. Co.*, 68 F.3d 1257, 1261 (10th Cir.1995) (to warrant a new trial, the award must be so excessive that it shocks the judicial conscience and raises "an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial...."). Even under this lenient standard, the damage award cannot stand. At trial, plaintiff's primary claim for damages was based on the allegation that excessive force used by the detention officers permanently injured his back and caused his eventual disability. In § 1983 cases, the plaintiff must prove that the defendant's actions were the proximate cause of the plaintiff's injuries. *See e.g., Gierlinger v. Gleason*, 160 F.3d 858, 872 (2nd Cir.1998). Except where the cause of an injury is apparent to a layman from common knowledge or experience, expert medical testimony is required to prove causation. *See Bacon v. Mercy Hospital*, 243 Kan. 303, 756 P.2d 416, 420 (1988). The fact that plaintiff's back problems started after this incident may have understandably led him to believe that his problems were caused by the incident. But individuals who suffer no traumatic episode sometimes develop identical symptoms. After hearing the evidence, it was clear to the court that plaintiff's injury is of the sort that requires expert medical testimony to establish causation.[8] Plaintiff produced no such testimony. Accordingly, the court instructed the jury it could award damages for any pain and suffering occurring shortly after the incident, but it "may not include damages for plaintiff's long-term back pain, his disability, or his medical expenses associated with that condition." Instruction No.

---

8. The medical reports introduced into evidence indicate that even the specialists consulted by plaintiff had a difficult time diagnosing his condition or attributing any particular cause to it. No proof was offered to show that the detention officer's use of force caused or contributed to the permanent back injury. In fact, one of the specialist's reports specifically indicated that the condition was likely not the result of a traumatic injury.

17. If the jury followed this instruction, there is no way it could reasonably arrive at damages in the amount of $500,000 based on the evidence presented. Aside from his alleged back injury, plaintiff offered no evidence of permanent or disabling injury. Under the circumstances, an award of $500,000 would clearly be excessive. As such, if the judgment in favor of the defendant were to be vacated, the court would grant the defendant's motion for a new trial insofar as damages are concerned.

## IV. *Conclusion.*

Judgment as a matter of law must be granted when the evidence fails to support the necessary elements of a claim under the governing law. In this case, the evidence was simply insufficient to show that Sedgwick County was deliberately indifferent to the use of excessive force against detainees at the Detention Facility, or that such indifference by the county was the cause of the violation of plaintiff's rights. Because these are necessary elements for a claim against the county under § 1983, the jury's verdict in favor of plaintiff must be vacated, and judgment as a matter of law must be entered for the county.

Accordingly, defendant Board of Sedgwick County Commissioner's Motion for Judgment as a Matter of Law (Docs.148, 150) is hereby GRANTED; defendant's motion for new trial (Doc. 159) is DENIED as moot; the judgment previously entered in favor of plaintiff on January 22, 2001, is hereby VACATED; and it is ordered and adjudged that plaintiff Carroll Lewis take nothing on his claims and that the action be dismissed on the merits, with each party to bear its own costs. The clerk of the district court is directed to enter judgment accordingly. IT IS SO

ORDERED this day of April, 2001, at Wichita, Ks.