**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 4 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

RODRIC CARR, JR., as Personal
Representative of the Estate of
Randall Carr, deceased,

       Plaintiff - Appellee,

v.

RANDY CASTLE; JERRY K. BOWEN,

       Defendants - Appellants,

and

CITY OF OKLAHOMA CITY,

       Defendant.

No. 02-6079

---

RODRIC CARR, JR., as Personal
Representative of the Estate of
Randall Carr, deceased,

       Plaintiff - Appellant,

v.

CITY OF OKLAHOMA CITY,

       Defendant - Appellee,

and

RANDY CASTLE; JERRY K. BOWEN,

No. 02-6132

Defendants.

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-01-124-C)**

---

John M. Merritt of Merritt & Associates, P.C., Oklahoma City, Oklahoma (Michael M. Blue with him on the substantive brief, and Johnnie L. Cochran, Jr. of Law Offices of Johnnie L. Cochran, Jr., Los Angeles, California with him on the jurisdictional brief), for Plaintiff-Appellee in No. 02-6079.

Stacey Haws Felkner of Phillips McFall McCaffrey McVay and Murrah, P.C., Oklahoma City, Oklahoma (Robert E. Manchester, Susan Ann Knight, June E. Machette with her on the briefs), for Defendants-Appellants in No. 02-6079.

John M. Merritt of Merritt & Associates, P.C., Oklahoma City, Oklahoma (Michael M. Blue with him on the briefs), for Plaintiff-Appellant in No. 02-6132.

Richard C. Smith, Assistant Municipal Counselor for City of Oklahoma City, Oklahoma City, Oklahoma (William R. Burkett, Municipal Counselor, with him on the brief), for Defendant-Appellee in No. 02-6132.

---

Before **EBEL** and **BRISCOE**, Circuit Judges, and **SHADUR**, District Judge.[*]

---

**SHADUR,** District Judge:

---

Rodric Carr, Jr. as personal representative of the estate of decedent Randall Carr,[1]

---

[*]    The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

[1]    Because the factual incident at issue on these appeals involved decedent
(continued...)

-2-

has brought a civil rights action against two Oklahoma City Police Department officers, Randy Castle ("Castle") and Jerry Bowen ("Bowen") (collectively "the Officers"), and Oklahoma City ("City") itself, charging each with a violation of Randall's constitutional rights. Both Officers were charged with the use of excessive force by shooting Randall fatally, while the City was charged with a failure to train or supervise the Officers that resulted in the shooting.

As for the claim against the Officers, they filed a Fed. R. Civ. P. ("Rule") 56 motion for summary judgment, asserting the defense of qualified immunity. That motion was denied by the district court, and the Officers have taken an interlocutory appeal from that ruling.

As for the City, it too filed a motion for summary judgment at a time when two earlier-filed motions to compel its production of certain documents were unresolved. About two months later Carr filed still another motion to compel, followed a few weeks thereafter by the filing of his response to the City's summary judgment motion. Despite the pendency of those motions, Carr did not seek to defer his summary judgment response, either by submitting a Rule 56(f) affidavit informing the court of an inability to respond to the City's dispositive motion or otherwise. Some two months later (on March 25, 2000) the district court sustained the City's motion for summary judgment and

---

[1] (...continued)
Randall Carr, this opinion will refer to him only by his first name. Personal representative Rodric Carr, Jr., who brought the action, will be referred to as "Carr."

found that Carr's last motion to compel (the only one about which he now complains on appeal) was moot. Carr appeals from summary judgment in the City's favor, pursuant to the district court's Rule 54(b) determination.

Factual Background

Events of the Fatal Night

On November 21, 2000 nondefendant Police Officer Elliott ("Elliott") responded to a call regarding an assault at an apartment building. Upon his arrival he spoke with the landlord, who claimed that Randall had struck him several times. Elliott went to Randall's door and knocked, but when no one answered Elliott returned to speak with the landlord. Shortly thereafter Bowen arrived and, accompanied by the landlord and Elliott, knocked on the apartment door. After the repeated knocking, Randall eventually opened the door and, according to Elliott, was acting very excited and aggressive. Elliott says that when he attempted to handcuff Randall, Randall struck him in the head and kicked Bowen in the groin.[2] Randall then ran from the building, pursued by both Elliott and Bowen. During the chase Randall emerged from a hiding place and moved toward Elliott, who testified that he sprayed Randall with OC spray and struck him with a baton.[3] Randall then struck at Elliott, who fell, and Randall ran away.

---

[2]   Bowen has a slightly different rendition of events that does not include the attempted handcuffing. That difference is irrelevant to this appeal.

[3]   But the medical examiner found no evidence of OC spray on Randall's head and face. That too has no present relevance.

-4-

During the chase Castle also arrived in response to calls for assistance. Eventually Randall came to a fence that he was unable to climb because he was holding a four-inch piece of concrete that the Officers had seen him pick up during the chase. Randall then ran toward Castle while raising his arm to throw the concrete at Castle. Although Castle and Bowen testified that they began firing their guns before the concrete left Randall's hand, impartial witness Jason Williams ("Williams") testified that the shots were fired after Randall had finished throwing the concrete. According to Castle, the concrete struck his left arm, causing minor bruising.[4]

Castle and Bowen fired 11 shots in all. According to the State Medical Examiner, all of the shots that hit Randall entered his back side, with the fatal shot having entered his buttocks, then having traveled through his stomach and lungs and into his heart's pericardial sac. According to Carr's experts, that could have occurred only if Randall had his head near the ground with his buttocks slightly elevated.

City's Policies and Training

Carr's experts found numerous asserted deficiencies in the City's policies and training programs. Primary among those was their allegation that the City's training was inadequate because specific instructions in the City's training program taught officers to shoot to kill rather than to shoot merely to eliminate an existing threat. But Carr also seeks

---

[4] Again Bowen's original statements stand in contrast. Though he later recanted, Bowen originally told investigators that the concrete also hit him in the leg, a version that would have placed him in front of Randall when the rock was thrown.

to rely on his experts' conclusions as to a host of other alleged City abuses: (1) inadequate training as to circumstances under which an investigatory detention is permissible, or in procedures for conducting an investigatory detention; (2) inadequate training as to control of subjects who might threaten officers with items similar to the concrete used by Randall; (3) failure to train officers to stop discharging their weapons after the threat had stopped; (4) inadequate training to recognize when the use of a rock would justify deadly force; (5) inadequate training in subject control tactics; (6) improper training in procedures to respond to citizens' complaints and citizens' arrests; (7) failure of the City's Firearms Training Simulator ("FATS II Series machine") to provide any shoot/don't shoot training relating to situations with a rock or other similar object; (8) failure to train officers properly in the recognition and proper handling of emotionally disturbed persons; (9) failure to conduct annual training of its officers; (10) failure to provide standard anger management training to officers; (11) failure to have an independent board or committee to review the use of force by officers; (12) a de facto City policy of turning a blind eye to unconstitutional conduct, as shown by the failures and long-term problems in the City's DNA Laboratory, specifically the misleading testimony provided by Joyce Gilchrist in the forensic work of numerous criminal trials; (13) failure to have a City procedure or policy that requires an officer to report when the officer is using a controlled substance or when

there is a physical or mental condition that might affect the officer's fitness for duty;[5] (14) inadequate training to recognize that an emotionally disturbed person should have been approached cautiously and in a non-confrontational manner; and (15) training that teaches officers that they are all- powerful and do not need a lawful articulable reason to detain a citizen.

Castle and Bowen not only received training at the Oklahoma City Police Department Training Academy, but were also provided in-the-field training from a veteran police officer and annual in-service training that included the permissible use of deadly force. Indeed, the City's written policy and its training of police officers on the use of deadly force have been upheld in cases litigated in the United States District Court for the Western District of Oklahoma. And according to testimony by the Police Department's training officer, police officers are trained to use deadly force only when necessary to defend themselves or another from imminent harm.

Officers' Claim of Qualified Immunity

We turn first to the Officers' appeal from the denial of their Rule 56 motion based on qualified immunity. In that respect the district court stated in relevant part (citation omitted):

However, when the submitted facts are considered in the light most favorable to

---

[5] During the incident Castle was on the medication Luvox, which is a treatment for obsessive compulsive disorder and can cause activation of mania/hypomania, anxiety, nervousness and psychotic reaction.

Plaintiff, it appears Mr. Carr was shot at a time when he no longer posed a threat of serious physical harm....Viewed in the light most favorable to Plaintiff, at the time the Defendant Officers acted, allowing for their need to "make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation," an objectively reasonable officer would not have found deadly force justified.

*     *     *

Plaintiff has also established that the law governing the actions of the Defendant Officers was clearly established at the time they acted and that the Defendant Officers' mistaken belief that they had the right to use deadly force was not reasonable.

In the past some courts addressing the subject of qualified immunity of law enforcement officers, particularly in the context of an alleged unconstitutional use of excessive force, had tended to conflate the qualified immunity inquiry with the constitutional inquiry. But Saucier v. Katz, 533 U.S.194, 201 (2001) has corrected that perception by identifying this as the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Then if that question gets an affirmative answer, "the next, sequential step is to ask whether the right was already established" (id.)--an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition" (id.).

Here the Officers do not argue that the law regarding the use of deadly force in violation of an individual's right against unjust seizures was not clearly established at the time of the incident. Rather they contend that "the use of deadly force against an

-8-

individual who is running at an officer armed with a piece of concrete is not unconstitutional and certainly was not prohibited by clearly existing law."

But that does violence to the teaching of <u>Saucier</u> and like cases, for it credits the Officers' version of events rather than--as is proper--the factual matrix most favorable to Carr. As stated earlier, on that score the testimony of witness Williams expressly said that Randall was no longer holding the concrete at the time the shots were fired.[6] And it will also be remembered that the forensic evidence was that the entire fusillade of shots struck Randall from the back.

From that pro-Carr perspective, as is required by Rule 56, the issue to be resolved becomes the familiar question of when an officer can use deadly force to apprehend an unarmed fleeing suspect--an issue thoroughly vetted nearly two decades ago in <u>Tennessee v. Garner</u>, 471 U.S. 1, 11-12 (1985).[7] We set out the portions of that pronouncement that (although it speaks in terms of "escape" rather than subduing someone) plainly control this case:

---

[6] Officers' attempted reliance on <u>Pena v. Leombruni</u>, 200 F.3d 1031 (7th Cir. 1999) begs the question, for the decedent in that case was unquestionably threatening the officer there with a chunk of concrete at the time the fatal shots were fired. In that context <u>Pena</u>, <u>id</u>. at 1035 held the officer "was reasonable to anticipate that his concrete-wielding assailant posed a potentially lethal danger." That of course casts no light at all on the reasonableness of an officer's shooting and killing an unarmed man who was not advancing on that officer--the situation that must be attributed to Randall here.

[7] Among other things, <u>Garner</u> plainly stands for the proposition that the right to be free from deadly force is a clearly established right, as well as the really tautological truth that deadly force may be excessive force in violation of the Fourth and Fourteenth Amendments.

Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so....A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

\*     \*     \*

Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

As the district court put it:

There is no question that at the time of the incident the law concerning when the use of deadly force is appropriate was clearly established. There was clear and ample Supreme Court and Tenth Circuit case law which predates the incident by several years.

In those terms and in terms of the facts as viewed from the required pro-Carr stance, the qualified immunity issue here would plainly come under the rubric marked out in Hope v. Pelzer, 536 U.S. 730 (2002).

Under such circumstances, "[e]ven when the district court concludes issues of material fact remain, we have reviewed the legal question of whether a defendant's conduct, as alleged by the plaintiff, violates clearly established law" (Medina v. Cram, 252 F.2d 1124, 1130 (10th Cir. 2001), citing earlier cases). We do so again here, and we uphold the district court's affirmative answer to that question. Because that answer is based on the assumed correctness of Carr's version, it is not of course the final answer. It

-10-

will rather be for the ultimate trier of fact to resolve which of the sharply disputed factual versions is to be credited, and hence whether Randall's clearly established constitutional rights were or were not actually violated.[8]

City's Claimed Failure To Train

We turn to the district court's grant of summary judgment in favor of the City, a ruling over which we have appellate jurisdiction by reason of the district court's proper determination under Rule 54(b). As the district court held and as Carr has admitted, the City's written policy on the use of deadly force is constitutional. Hence the focus of the current appeal is on the allegedly improper training that the Officers received. Brown v. Gray, 227 F.3d 1278, 1286 (10th Cir. 2000) has quoted from Allen v. Muskogee, 119 F.3d 837, 841-42 (10th Cir. 1997), in turn relying on City of Canton v. Harris, 489 U.S. 378, 388 (1989) to set out the requirements of a failure to train:

> In order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a Plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:
>
> > (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of the city toward persons

---

[8]    Among other factual issues that may potentially need to be resolved is whether the Officers truly--and reasonably--believed that they had fired while Randall was still threatening them with the concrete in hand. In that regard the divergent nature of the testimony here renders the Officers' effort to rely on the post-Hope decision in Willingham v. Loughnan, 321 F.3d 1299 (11th Cir. 2003) wholly unpersuasive.

with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

In this instance Carr's evidence meets those first two requirements. As we have just held with regard to the first factor, in the context of a summary judgment motion the Officers exceeded the constitutional limitation on the use of force by using deadly force against Randall at a time when it was not warranted because there was no imminent harm to the police officers or others. And as for the second element, the district court correctly found that the City's officers can reasonably be expected to regularly confront aggressive violent persons who are armed with some type of potential weapon. It is thus the other two City of Canton-Brown requirements on which Carr founders.

Deliberate Indifference

As to the third factor, Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998) (internal quotation marks and citations omitted) instructs what Carr must do to prove[9] his claim of deliberate indifference:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to

---

[9]  In the summary judgment context, of course, Carr's burden is only that of creating reasonable inferences, not one of proof as such. But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what a party responding to a Rule 56 motion must "establish" or "prove" or "show." Whenever this opinion employs such terms, it should therefore be understood as denoting Carr's lesser burden of creating reasonable inferences, not the actual burden of persuasion.

-12-

disregard the risk of harm.  In most instances, notice can be established by proving the existence of a pattern of tortious conduct.  In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations

Even where the City's "policy is not unconstitutional, a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy" (Brown, 227 F. 3d at 1286).[10]  Here, despite Carr's scattershot recital of alleged inadequacies, he fails to provide evidence of how the City had notice that its actions (or failures to act) were likely to result in constitutional violations.  Additionally, Carr has not illustrated how the City consciously chose to disregard the risk of harm.

Thus Carr lists various of the Officer's actions that he claims they would not have taken if they were well-trained.  But as Brown, 227 F.3d at 1288-89 teaches, "[t]he touchstone of this inquiry...is the risk inadequate training poses and the City's awareness

---

[10]     City of Canton, 489 U.S. at 390-91 (citations omitted) cabins the literal breadth of that statement:

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.  It may be, for example, that an otherwise sound program has occasionally been negligently administered.

of that risk." Moreover, a finding of "deliberate indifference" in this situation requires a showing that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" (City of Canton, 489 U.S. at 390). Unlike the situation in Brown, in which a policy maker described a conscious training choice that on-and-off-shift police situations should be handled identically, Carr provides no evidence that the City made such deliberate choices regarding any training. Instead Carr merely enumerates the multiple ways in which he contends the Officers were inadequately trained, but without proffering any evidence of knowledge of the purported deficiencies on the part of the City. Carr's claimed experts also merely assert that the City failed to train, but nowhere do they show that the need for training was obvious to the City in the City of Canton sense.

Carr attempts to rely heavily on Allen v. Muskogee as an example of a similar factual and legal scenario in which deliberate indifference (and a direct causal link) were found. Not so--the situations in the two cases are really nonparallel. While Allen, 119 F.3d at 842-43 identified (and then dealt with) specific training that was "out of synch with the entire United States in terms of what police are being trained to do" (id. at 843), no such situation existed here. Instead Carr (and his experts) rely on the absence of specific training for the Officers that assertedly could have helped them during the encounter. But those assertions merely demonstrate the omniscience of hindsight, rather

-14-

than satisfying the demands of City of Canton and hence Brown.

For example, Carr's expert Dr. George Kirkham ("Kirkham") concluded that "prudent well-trained officers would have realized that Mr. Carr was an emotionally disturbed person, and thus should be approached in as cautious and non-confrontational manner as possible. Instead Officers Bowen and Castle closed the distance between themselves and Mr. Carr, with weapons drawn and shouting commands at him. " But the fact that someone with the opportunity to prepare an expert report at leisure opines that well-trained officers would have performed differently under pressure does not rise to the legal standard of deliberate indifference on the part of the City, for Carr fails to point to any evidence placing the City on actual or constructive notice that the asserted failures to train were substantially certain to result in a constitutional violation.

We find it unnecessary to discuss the multitude of other asserted training failures included in the laundry lists generated by Kirkham and Carr's other expert witness Larry Danaher ("Danaher"). Any such need is entirely obviated by Carr's total inability to surmount the fourth City of Canton-Brown hurdle: that requiring a direct causal link, as discussed in the next section of this opinion. Moreover, the district court concluded that the opinions of both Kirkham and Danaher were without evidentiary support and refused to rely on either as support for Carr's contention that the City had notice of failure to train and what those failures were.

One aspect of Carr's claim, however, does call for specific consideration at this

-15-

point: his assertion that the City was guilty of constitutionally defective actual training of its officers, over and above its purported omissions of other necessary training. In that respect Carr points to what he characterizes as the testimony of both Officers that they were taught to use deadly force, rather than to wound. Carr claims that the Officers were thus trained to "continu[e] to shoot into Randall Carr's back until he was dead" and argues that any such training is a clear violation of Randall's constitutional rights.

If the City had actually trained its Officers to "shoot until dead," Carr would have been able to survive summary judgment, for the City would obviously have been on notice of, and nonetheless consciously disregarded, the potential harm. But Carr's contention distorts not only the Officers' testimony but, more importantly, the nature of the training at issue.

What the Officers' testimony really reveals is their understanding that they were ordered to shoot to kill only when they were confronted with situations that required the use of deadly force as discussed in Tennessee v. Garner: self-defense or the fleeing felon rule. In those situations officers are allowed to shoot to kill because the imminent danger to themselves or the community necessitates it. And such rules were meticulously described in the City's training materials.

But most significantly in terms of the City's potential exposure to liability, nowhere in its training manuals or even in the Officers' testimony is there evidence, as Carr would have it, that officers were taught to continue shooting until the individual was

-16-

dead if the situation allowing deadly force had passed. Nor is Carr aided by the affidavit of Danaher that seeks to target the City because the Officers continued to discharge their firearms after the threat had stopped--a deviation from professional and generally accepted police standards and practices. On that score City of Canton, 489 U.S. at 491 provides the answer:

> And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

> By the same token, Carr does not raise a genuine issue of material fact by

adverting to Danaher's reliance on the failure of the Firearms Training Simulator ("FATS II") to have shoot/don't shoot scenarios where officers are confronted with non-lethal weapons. Carr seeks to label that as reflecting reckless and deliberate indifference for the constitutional rights of the public. But training situations besides the FATS II shoot/don't shoot situations were provided to school officers in different situations in which deadly force would or would not be justified --and it distorts the record for Danaher to refer only to certain portions of the training, to the neglect of the entire training program. As has been true of the rest of this section of our opinion, Carr has not identified any predicate for viewing the City's training or failure to train as constitutionally deficient.

Direct Causal Link

That brings us to the fourth component of Carr's required showing against the

-17-

City:  how its assertedly inadequate training was a direct causal link of Randall's injury.

In that respect <u>Brown</u>, 227 F.3d at 1290 (internal quotation marks and citations omitted),

drawing on <u>City of Canton</u>, 489 U.S. at 391 and  <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S.

658, 691 (1978), expanded on that need for linkage:

> It is when execution of a government's policy or custom...inflicts the injury
> that the government as an entity is responsible under §1983.  Therefore, in
> order for liability to attach in a failure to train case, the identified deficiency
> in a city's training program must be closely related to the ultimate injury, so
> that it actually caused the constitutional violation.

So Carr must show how part or all of the long list of the City's alleged failures to

train actually caused the Officers' imposition of excessive force.  Many courts have

highlighted the importance of the "closely related" requirement, ruling that a general lack

of training is insufficient (see, e.g., <u>Lopez v. LeMaster</u>, 172 F.3d 756, 760 (10th Cir.

1999)).  And Carr has identified nothing in his laundry list of assertedly inadequate

training that can be said to have led directly to the use of excessive force against Randall.

Only the "shoot until dead" argument had the potential for inferring a direct causal link

from defective training to Randall's harm, but that contention has been thoroughly

discredited in the preceding section.

All of Carr's other assertions of alleged failure to train or inadequate training flunk

the causation requirement, for they uniformly partake of the post hoc, ergo propter hoc

fallacy rather than providing any evidence of how the training (or lack thereof) actually

resulted in the excessive force.   And they suffer as well from the deficiency that was

-18-

identified in <u>Allen</u>, 119 F.3d at 844 (this court's decision on which Carr attempts to rely most heavily):

> There was evidence the officers were trained to act in such [an expressly reckless] manner and, thus, were trained to do precisely the wrong thing. The causal link between the officers' training and the alleged constitutional deprivation is more direct than in cases in which officers are not given enough training to know the correct response to a dangerous situation.

Even if Carr is viewed from the most favorable perspective in terms of the Officers not having been trained to know how to react exactly to an individual who had just thrown a four-inch piece of concrete, one thing is certain: They were not trained by the City to shoot him repeatedly in the back after he no longer posed a threat. In sum, even if some inadequacy in training had been shown, Carr cannot demonstrate how it was a direct cause of the Officers' actions and of Randall's consequent death.

<u>Additional Allegations Against the City</u>

Besides the overarching (and unsuccessful) failure to train theory as such, Carr's experts offer up a hodgepodge of added assertions in claimed support of the City's liability. Carr obviously hopes that the multiplicity of such contentions can accomplish what his basic argument could not:

> All of the inadequate training, absence of training, inadequate policies, practices, rules and procedures, lack of policies, rules and procedures and unconstitutional policies, practices and procedures, unconstitutional de facto polices and condonation of excessive force by OKCPD police officers are pervasive, usual and recurring, grossly negligent, reckless and constitute a deliberate and conscious choice which evidence a deliberate indifference by the Defendant OKCPD and are a direct causal link to the illegal seizures and excessive force which ultimately resulted in Randall Carr's death.

But neither sheer bulk nor pejorative adjectives can compensate for a lack of quality. We have reviewed all of those contentions with care and have found that many of them are factually baseless, that most (if not all) of the remainder do not imply (let alone show) the City's deliberate indifference and that in all events none of them, even with the required favorable inferences, provides a direct causal link to Randall's death. We see no need to lengthen this opinion with a chapter-and-verse treatment of Carr's arguments.

Carr's Discovery Motion

Carr also requests that we review the district court's decision to strike one of Carr's motions to compel discovery. In that respect Carr correctly cites to our holding that any district court's discovery rulings are reviewed under an abuse of discretion standard (GWN Petroleum Corp. v. OK-Tex Oil & Gas, Inc., 998 F.2d 853, 858 (10th Cir. 1993)).

In this instance Carr had filed a motion on January 2, 2002 seeking to compel the City to produce incident reports involving excessive use of force by the City's police officers, and the district court declared that motion "moot" in its March 25, 2002 order granting the City's summary judgment motion. In doing so the district court pointed to Carr's failure to file a Rule 56(f) affidavit alerting the court to any claimed inability to present an adequate response to the City's Rule 56 motion, either with Carr's answering brief or with its surreply brief.

As Carr would have it, the mere pendency of his unruled-upon January 2 motion to compel at the time the City filed its summary judgment motion should have alerted the court to his claimed need for more information to respond. But that is a non sequitur: Not all discovery motions necessarily implicate issues necessary to stave off an adversary's effort to obtain a summary judgment, and counsel must recognize that it is the lawyer's responsibility and not that of a busy district judge to police that necessity or the lack of it. Indeed, that obligation is directly confirmed by the ready availability of a Rule 56(f) affidavit to a summary judgment respondent.

We have understandably applied Rule 56(f)--specifically including its affidavit requirement--just as it reads, as by our holding in Committee for the First Amendment v. Campbell, 962 F.2d 1517, 1522 (10th Cir. 1992). In the absence of a Rule 56(f) affidavit from Carr--and none was tendered to the district court--it is really not relevant whether the added discovery sought by the motion to compel was or was not itself relevant to the resolution of the City's Rule 56 motion (a matter on which the parties differ). We cannot and do not find that the district court abused its discretion in finding Carr's motion to compel rendered moot because of the absence of a Rule 56(f) request.

### Conclusion

We hold that the district court's rulings as to all of the issues now on appeal were sound, and we AFFIRM in both Case No. 02-6079 and Case No. 02-6132. Because the appeal in Case No. 02-6079 was interlocutory, we REMAND to the district court so that it

-21-

may deal with Carr's claim against the Officers on the merits.