FILED
United States Court of Appeals
Tenth Circuit

September 16, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENT CIRCUIT

---

VICKI JO LEWIS and TROY LEVET
LEWIS, individually and as co-
personal representatives of the
ESTATE OF ISAIAH MARK LEWIS,
deceased,

       Plaintiffs - Appellees,

v.

CITY OF EDMOND, an Oklahoma
municipal corporation; POLICE
SERGEANT MILO BOX,

       Defendants,

and

POLICE OFFICER DENTON
SCHERMAN,

       Defendant - Appellant.

No. 21-6081

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:19-CV-00489-R)

---

Kathryn D. Terry (Catherine L. Campbell and Cody J. Cooper, with her on the
briefs), Phillips Murrah, P.C., Oklahoma City, Oklahoma, for Defendant-Appellant.

Devi M. Rao, Roderick & Solange MacArthur Justice Center (Daniel M. Greenfield,
Roderick & Solange MacArthur Justice Center, Northwestern Pritzker School
of Law, Chicago, Illinois, Easha Anand, Roderick & Solange MacArthur Justice

Center, San Francisco, California, and Christina N. Davis, Roderick & Solange MacArthur Justice Center, Washington, D.C. on the brief), Washington, D.C., for Plaintiffs-Appellees.

---

Before **HARTZ**, **BALDOCK**, and **McHUGH**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

Officer Denton Scherman of the Edmond, Oklahoma Police Department shot an unarmed assailant, Isaiah Mark Lewis, four times (a fifth shot missed). Lewis died as a result of his wounds. Plaintiffs, the representatives of Lewis's estate, brought this civil rights action under 42 U.S.C. § 1983 alleging Defendant Scherman used excessive force against the decedent in violation of the Fourth Amendment. Scherman now appeals the district court's decision denying his motion for summary judgment based on qualified immunity. *Lewis v. City of Edmond*, No. CIV-19-489-R, 2021 WL 2815851 (W.D. Okla. July 6, 2021). We reverse.

Our jurisdiction to review this denial, though limited, arises under 28 U.S.C. § 1291 via the collateral order doctrine. *See Duda v. Elder*, 7 F.4th 899, 909–10 (10th Cir. 2021). Our jurisdiction is limited because at this intermediate stage of the litigation, controlling precedent generally precludes us from reviewing a district court's factual findings if those findings have (as they do here) at least minimal support in the record. *See Lynch v. Barrett*, 703 F.3d 1153, 1158–60, 1160 n.2 (10th Cir. 2013). In such case, "[t]hose facts explicitly found by the district court,

2

combined with those that it likely assumed, . . . form the universe of facts upon which we base our legal review of whether [a] defendant[] [is] entitled to qualified immunity." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008). Our legal review, which is de novo, is confined to "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, and (2) whether th[e] [applicable] law was clearly established at the time of the alleged violation." *Dalton v. Reynolds*, 2 F.4th 1300, 1307–08 (10th Cir. 2021) (cleaned up) (quoting *Roosevelt-Hennix v. Drickett*, 717 F.3d 751, 753 (10th Cir. 2013)).

Defendant Scherman does not dispute the facts recited by the district court, when viewed in a light most favorable to Plaintiffs, suffice to show a violation of the decedent's Fourth Amendment right to be free from excessive force. *See City & Cty. of S.F. v. Sheehan*, 575 U.S. 600, 603 (2015) ("Because this case arises in a summary judgment posture, we view the facts in the light most favorable to . . . the nonmoving party."). Accordingly, we assume without deciding that those facts are sufficient to establish a constitutional violation. What Scherman does dispute is the district court's holding that the law was clearly established at the time of the incident such "that *every* reasonable [officer] would have understood" Scherman's actions, given the facts knowable to him, violated decedent's constitutional right. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (emphasis added) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)); *see also White v. Pauly*

3

(*Pauly I*), 580 U.S. 73, 76–77 (2017) (per curiam) ("Because this case concerns the defense of qualified immunity, . . . the Court considers only the facts that were knowable to the defendant officers.").

I.

The facts recited by the district court are as follows. Lewis was at his girlfriend's house around 10:30 a.m. on April 29, 2019, when she noticed he was acting strangely. An altercation arose after Lewis asked to look at his girlfriend's cell phone. An individual outside the house heard the altercation. Around 1:00 p.m., a neighbor called 911 and stated a young man was "beating up" a girl. *Lewis*, 2021 WL 2815851, at *1. In response to the call, police officers arrived on the scene around 1:04 p.m. Upon their arrival, Lewis's girlfriend told the officers that reports of a physical altercation between the two were overblown.

While officers were en route, Lewis removed his clothing and fled his girlfriend's house on foot. For the next hour or so, Lewis eluded police by running naked around the neighborhood and hiding. Although not part of the initial response team, Sergeant Milo Box and Defendant Scherman were assisting in the search for Lewis when they spotted him in a yard in a nearby neighborhood. Box and Scherman both knew a call referencing a domestic disturbance triggered the original dispatch. As Scherman slowly drove past Lewis, Box exited the patrol car, identified himself as a police officer, pointed his taser at Lewis, and commanded him to stop and get

4

on the ground.  Rather than comply, Lewis turned toward the nearest residence and forced his way inside by busting through the front door's oval glass window.

After watching Lewis physically break through the front door, Sergeant Box believed the residence was not Lewis's home.  Whether anyone was in the home was unknown.  Box followed Lewis inside.  Box observed Lewis attempting to exit the back door and again commanded him to stop and get on the ground.  Lewis then turned on Box and charged at him.  Box deployed his taser on Lewis without effect.  While Box and Lewis "fought" in the living room, Box deployed his taser a second time, again without effect.  *Id*.  By this time, Defendant Scherman had entered the residence.

Scherman moved from the front entry hallway, a "small space," into the living room where he observed "Lewis pummeling Box," a felony under Oklahoma law. *Id* at *1, *7; *see* Okla. Stat. tit. 21, § 649(B) (proscribing assault and battery upon a police officer).  According to the district court, while Scherman watched, "Lewis 'continued to strike Box in the head, face, and neck,' and Box attempted to use his taser [a third time] to 'drive stun' Lewis." *Lewis*, 2021 WL 2815851, at *1.  The taser failed to subdue Lewis, and Box disappeared from Scherman's line of sight. Lewis then turned toward Scherman, whom the district court described as an "undersized officer." *Id*. at *7.  Scherman drew his firearm.  As Lewis advanced

5

toward him, Scherman shot Lewis four times in the front of his body.  Lewis

sustained gunshot wounds to his face, groin, and both thighs.

At the point Defendant Scherman began shooting, the parties' respective

versions of events diverge, so an understanding of what the district court actually

found is critical.  In the district court's words:

> [T]he Plaintiffs do not dispute that after his fight with Box in the living
> room, Lewis turned toward Scherman and advanced in his direction as
> Scherman backed down the entry hallway toward the front door.  Four
> gunshot wounds in the front of Lewis's body and the bullet casings
> recorded in the Edmond police department's crime scene sketch confirm
> this account.

*Id*. at *2 (record citations omitted).  Notably, however, the district court rejected as

contrary to Plaintiffs' evidence Defendant Scherman's claim (1) that Lewis barreled

toward or charged him in a tackling position, (2) that Lewis was close enough to land

a punch on his face, and (3) that he shot Lewis from close range.  Instead, Plaintiffs

say Lewis "moved his arms in a windmill motion" while he advanced towards

Scherman and he was "more than one and a half to two feet away from Scherman

when Scherman discharged his firearm."  *Id*. (internal brackets omitted).

## II.

On the question of whether Defendant Scherman violated Lewis's right to be

free from excessive force, the district court found that "after Scherman first shot

Lewis, Lewis no longer 'continued to barrel toward him . . . .'  A reasonable jury

could conclude that, *after* Scherman discharged his firearm once, Lewis no longer

6

presented a threat of serious physical harm" to Scherman or others.[1]  *Id*. at *7

(cleaned up) (emphasis added); *see Tennessee v. Garner*, 471 U.S. 1, 11 (1985)

(holding that where a suspect poses no immediate threat to the officer or others, the

use of deadly force is excessive).  As noted, Scherman does not challenge the district

court's finding that when he shot Lewis multiple times, his use of force was

objectively unreasonable and violated the Fourth Amendment.  *See Graham v.*

*Connor*, 490 U.S. 386, 388 (1989) (holding an objective reasonableness standard

governs Fourth Amendment excessive force claims).  The only question for our

resolution then is whether the law at the time of the incident was "clearly

established," or, in other words, provided "fair warning" to a reasonable officer that

his conduct was unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002).

---

[1]  Throughout their brief, Plaintiffs presume the district court's rejection of
Scherman's claim that after the first shot, Lewis "continued to barrel toward him"
constitutes a finding that "Scherman's first shot stopped [Lewis] in his tracks" so
that Lewis "ceased moving toward Scherman after the first shot."  Appellees' Br. at
30, 35 n.18; *see also id*. at 2, 12, 28, 43.  But the district court made no such finding
and the wounds in the front of Lewis's body certainly suggest otherwise.  One may
advance toward another without barreling toward him.  *See* Webster's Third New
International Dictionary 179 (Philip Babcock Gove ed.,1981) (defining "barrel" as
"to travel fast").  Our point is well illustrated by the district court's later observation
and conclusion that "even though Lewis was approaching Scherman," his use of
force violated clearly established law. *Lewis*, 2021 WL 2815851, at *8.  In light of
the court's prior statement that Scherman no longer faced a serious risk of harm
*"after* [he] discharged his firearm once," *i.e.*, the first shot did not constitute
excessive force, this latter statement, made in the context of the court's clearly
established analysis, can only be read to mean Lewis continued to advance toward
Scherman after the first shot.  *Id*. at *7 (emphasis added).

7

Because Defendant Scherman raised the defense of qualified immunity, Plaintiffs have the burden of demonstrating the constitutional violation was clearly established on the date of the incident, April 29, 2019.[2] *See Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1168–69 (10th Cir. 2020).

So what constitutes the fair warning necessary for us to conclude the law was clearly established? According to Plaintiffs, "it has been clearly established for over a decade that the use of deadly force is unreasonable when a reasonable officer would have perceived that the threat has passed." Appellee's Br. at 27 (internal quotes omitted). Plaintiffs posit that because the district court found any serious threat to Scherman had passed after the first shot, at the very least "clearly established law forbade Scherman's second, third, and fourth shots." *Id*. at 27–28. Contrary to Plaintiffs' approach, however, the Supreme Court has told us *ad nauseam*, most recently in *City of Tahlequah v. Bond*, "not to define clearly established law at too high a level of generality." 142 S. Ct. 9, 11 (2021) (per curiam); *see also Pauly I*, 580 U.S. at 79 ("Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011))).

---

[2] "This clearly established standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up).

8

Statements derived from *Tennessee v. Garner* and its progeny that lay out excessive force principles or rules "at only a general level" "do not by themselves create clearly established law."[3] *Id.* at 79–80 (internal quotes and cites omitted).

Consistent with the Supreme Court's instructions, our inquiry "must be undertaken in light of the specific context of the case, not . . . [the] broad general proposition" Plaintiffs endorse. *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). While we do not require a prior case directly on point for the law to be clearly established, the Supreme Court tells us the law must be "settled." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). This means "controlling authority" at the time of the incident, *i.e.*, a Supreme Court or Tenth Circuit published decision, or a "robust consensus of cases of persuasive authority," made clear the unconstitutionality of Defendant Scherman's use of deadly force against Lewis. *Id.* at 589–90 (cleaned up).

That then-existing precedent may have "suggested" the unconstitutionality of Scherman's conduct is insufficient. *Id.* at 590. The precedent "must be clear

---

[3] Plaintiffs do not argue the present controversy is "the rare 'obvious case,' where the unlawfulness of the office's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). And most assuredly this case does not present the sort of facts "where a body of relevant case law is not needed" to overcome a qualified immunity defense. *Id.* at 591 (internal quotes omitted); *cf. Hope*, 536 U.S. at 741 (use of a hitching post to unnecessarily and wantonly inflict punishment on an inmate constitutes an obvious and therefore clearly established Eighth Amendment violation).

enough that *every* reasonable official would interpret it to establish" the unconstitutionality of Scherman's conduct. *Id*. (emphasis added). In other words, Scherman "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any* reasonable official in [Scherman's] shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (emphasis added). Existing precedent "must have placed the [un]constitutionality of [Defendant Scherman's] conduct 'beyond debate,'" a demanding standard the Supreme Court says "requires a high 'degree of specificity.'" *Wesby*, 138 S. Ct. at 589–90 (quoting *Mullenix*, 577 U.S. at 13). The clearly established standard requires that the legal principle Plaintiffs seek to apply "clearly prohibit [Scherman's] conduct *in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that [Scherman's] conduct was unlawful in the situation he confronted." Id*. at 590 (emphasis added) (internal quotes omitted).

Even more to the point, the Supreme Court has also repeatedly stressed the importance of specificity in the context of excessive force claims arising under the Fourth Amendment. *See, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam). Specificity in such context is important because circumstances that are "tense, uncertain, and rapidly evolving" often force police officers to make "split-second judgments . . . about the amount of force that is necessary in a

10

particular situation." *Graham*, 490 U.S. at 397.  However tempting, we must avoid

the "20/20 vision of hindsight." *Id*. at 396.  Rather, we must recognize that an

officer may have difficulty determining "how the relevant legal doctrine . . . will

apply to the factual situation the officer confronts."[4] *Kisela v. Hughes*, 138 S. Ct.

1148, 1152 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 12).  Claims of

excessive force turn "very much on the facts of each case," and a police officer is

entitled to qualified immunity unless existing prior precedent "squarely governs" the

specific facts at issue.  *Id.* at 1153 (quoting *Mullenix*, 577 U.S. at 13).

### III.

In this case, the district court contravened the settled principles the Supreme

Court has instructed us time and time again to apply when a police officer raises

the defense of qualified immunity in response to a Fourth Amendment excessive

force claim.  Simply put, none of the cases cited by the district court or Plaintiffs

decided before April 29, 2019 "squarely governs," *Brosseau*, 543 U.S. at 201, the

case at bar or places the unconstitutionality of Defendant Scherman's use of force

---

[4] Plaintiffs provide us with numerous examples of 20/20 hindsight in their brief.  For instance, Plaintiffs argue that while Lewis fought with Box, "Scherman did not attempt to restrain [Lewis] or deploy his own taser at that time notwithstanding his 'clear tactical advantage' while [Lewis] was turned away and struggling with Box." Appellee' Br. at 11.  Without any citation to a prior case with similar facts, we fail to see how such an argument bears on the question of whether the unlawfulness of Defendant Scherman's conduct was clearly established under the rapidly evolving circumstances he confronted.  While such argument may bear upon the (un)reasonableness of Scherman's conduct, that question is not before us.

"beyond debate," *al-Kidd*, 563 U.S. at 741. Nor has our independent research uncovered such a case. Moreover, we remain mindful that cases decided after Lewis's death are of "*no use* in the clearly established inquiry." *City of Tahlequah*, 142 S. Ct. at 12 (emphasis added) (citing *Brosseau*, 543 U.S. at 200 n.4); *see also Kisela*, 138 S. Ct. at 1154 ("[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious.").

Let us begin our comparison with prior precedent as it existed on April 29, 2019, by observing that this is not a case where an officer's alleged reckless conduct created the need to use deadly force against Lewis. *See Pauly v. White* (*Pauly II*), 874 F.3d 1197, 1219–21 (10th Cir. 2017) (on remand). So a case such as *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), cited by both Plaintiffs and the district court, has no bearing on the outcome here. "The officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect [who was threatening no one], and attempting to physically wrest a gun from his hands." *City of Tahlequah*, 142 S. Ct. at 12; *see Allen*, 119 F.3d at 839. As a result, the suspect ended up pointing his gun at one of the officers and was, in turn, fired upon twelve times and shot four times. *Id.* In contrast, the district court in our case found "it was objectively reasonable for [Sergeant] Box to exit [the] vehicle [Defendant Scherman was driving], announce his presence, and point a taser at Lewis." *Lewis*,

12

2021 WL 2815851, at *5.  The court further found Box acted reasonably when he pursued Lewis after Lewis refused to comply with Box's commands to "get down" and instead physically broke into a nearby residence.  *Id*.

At this point, Scherman undoubtedly was aware that Lewis, in his efforts to evade arrest, had broken into a residence that probably was not his own and was fleeing from Box, who was in hot pursuit.  Unlike the facts of any decision we have encountered, Defendant Scherman entered the residence's front entrance shortly thereafter and observed Lewis actively battering Sergeant Box in the living room, a violent felony under Oklahoma law.  Lewis was "pummeling Box," which means he was striking Box repeatedly with his fists.  *Id*. at *1.  In fact, Scherman witnessed Lewis "continue[] to strike Box in the head, face, and neck."  *Id*.  He also witnessed Box unsuccessfully "attempt[] to use his taser to 'drive stun' Lewis."  *Id*.  When Box disappeared from sight and Lewis turned his focus to Scherman, Scherman could reasonably presume Box *at the very least* had been rendered immobile if not seriously injured as a result of his encounter with Lewis.  And Scherman knew Lewis had ignored Box's commands and was unaffected by Box's taser.  Lewis backed up within a confined space while Scherman moved forward, swinging his arms in a windmill fashion.  When Scherman fired his first shot, Lewis was "more than one and half to two feet away from Scherman" *Id*. at *2.  How much "more" the district court does not say.  But this finding in itself does not suggest a significant distance.

13

Indeed, the court found as to Scherman's first shot that "a reasonable, undersized officer without the benefit of hindsight could have believed he faced danger of serious bodily harm." *Id*. at *7.

The totality of these facts readily distinguish our case from cases on which Plaintiffs rely in an effort to meet their burden. *See Arnold v. City of Olathe*, 35 F.4th 778, 789 (10th Cir. 2022) ("[O]ur reasonableness inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." (internal quotes omitted)). For instance, in *Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016), officers performing a welfare check chased the decedent, a suspected unarmed misdemeanant, off his bicycle and repeatedly tased him (up to ten times) within a span of two minutes after he had been subdued. *Id*. at 1200–04. In *Fancher v. Barrientos*, 723 F.3d 1191 (10th Cir. 2013), the officer, responding to a report of stolen beer, fired his weapon into the suspect's chest after the suspect took control of the officer's still-running patrol vehicle that the officer had left to pursue the suspect on foot. After the first shot, the officer saw the suspect slump. The officer testified that after the first shot, he stepped away from the vehicle and felt safer before firing at the suspect six more times. We explained the officer fired six shots into a suspect that was no longer able to control the patrol vehicle, escape, or fire the long guns located inside the vehicle. Prior to his additional shots, the officer stepped back, felt safer, and noticed the decedent had

14

slumped. This provided the officer enough time to recognize and react to the changed circumstances and cease firing. *Id*. at 1194–98, 1201. Finally, in *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003), a fleeing suspect, otherwise unarmed, threw a four-inch piece of concrete at two officers. After the suspect had thrown the concrete, the officers fired eleven shots at him. All the shots that hit the decedent entered his back side, with the fatal shot entering his buttocks and coming to rest in his heart. According to plaintiff's expert, this could have occurred only if the decedent had his head near the ground with his buttocks slightly elevated, hardly a position from which to threaten the officers. *Id*. at 1225, 1227.

Understandably, the district court relied on none of these cases to conclude the law was clearly established at the time Defendant Scherman fatally shot Lewis. This is because in all of these decisions the suspect had *clearly* been subdued in an outdoors setting, making the continued use of deadly force plainly unjustifiable. In contrast, the present case presents a situation where Defendant Scherman had good reason to believe Lewis in his attempts to evade arrest had battered Sergeant Box into submission before turning his attention to Scherman, all within a confined area. And Scherman knew all too well that verbal commands and force less lethal than a gun shot had been unsuccessful in stopping Lewis's rampage. When, after the first shot, Lewis continued to advance toward Scherman in this confined area, no prior decision placed "beyond debate," *Mullenix*, 577 U.S. at 14, the proposition that

15

Scherman's subsequent shots in a "tense, uncertain, and rapidly evolving" situation requiring a "split-second" judgment constituted excessive force in violation of the Fourth Amendment. *Graham*, 490 U.S. at 397. These prior cases on which Plaintiff relies do not "squarely govern[]" the outcome here because none of them held an officer violated the Fourth Amendment while acting under circumstances similar to those Defendant Scherman faced. *Brosseau*, 543 U.S. at 201.

Rather, the district court relied on our decision in *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019), decided in March 2019, to conclude that "even though Lewis was approaching Scherman," an objective officer would have been on notice that continuing to employ deadly force violated the Fourth Amendment. *Lewis*, 2021 WL 2815851, at *8. In *Ceballos*, however, the suspect was "in his own driveway, with no one else around, and he was fully contained at the time he was shot and killed." 919 F.3d at 1220. Unlike our case, *Ceballos* was not only about whether an officer was in danger at the precise moment he used deadly force, but also, like *Allen*, whether an officer's own conduct in carelessly approaching a suspect unreasonably created the need to use such force.

In *Ceballos*, the suspect's wife summoned police because her husband was in the driveway of their home, swinging a baseball bat, and acting crazy. No one was in the immediate vicinity of Ceballos (everyone had retreated down the street) when two officers began approaching him from around 100 yards and shouting commands

16

to drop the bat. Ceballos retreated into his garage and one officer drew his firearm. Ceballos emerged from his garage with the bat still in his hand and began walking toward the officers. When Ceballos did not comply with commands to stop and drop the bat, the officer who drew his firearm shot and killed Ceballos. All this occurred within a minute of officers arriving on the scene. *Id*. at 1209–11, 1216, 1218. The two officers testified they did not retreat from Ceballos because "they wanted to contain him and prevent him from running away and endangering the public." *Id*. at 1210–11. A third officer on the scene stated "he did not think that either his own life or the lives of the other officers were in danger given their respective distances from Ceballos and that he was armed with a baseball bat." *Id*. at 1210. Under the plaintiff's version of the facts, which the defendant officer accepted for purposes of appeal, the officers "approached Ceballos quickly, screaming at [him] to drop the bat and refusing to give ground as Ceballos approached [them]." *Id*. at 1216. We explained that, based on *Allen*, the law was clearly established that an officer violates the Fourth Amendment when his reckless conduct results in the need for lethal force. We further explained that *Allen* clearly established that an officer acts unconstitutionally when he relies on lethal force as a first resort in confronting an irrational suspect armed with a weapon of short-range lethality who is on his own property. *Id*. at 1219.

17

The first important difference between our case and *Ceballos* is the district court found Sergeant Box acted reasonably when he initially approached Lewis. Unlike in *Allen* or *Ceballos,* the fact that Box and Scherman pursued Lewis into a house they saw Lewis physically break into did not unreasonably escalate the situation. A second difference is Defendant Scherman knew before drawing his firearm that Lewis (1) had not responded to non-lethal force, (2) had, by whatever means, rendered Box immobile, and (3) was committing a violent felony upon Box's person. A third difference is Scherman and Lewis were in a confined area making it difficult if not impossible for Scherman to retreat as Lewis advanced toward him while swinging his arms.

We need not belabor the point. Neither the district court nor Plaintiffs have identified a precedent finding a Fourth Amendment violation under the circumstances Defendant Scherman faced in this case. None of the cases they identify provided *fair notice* to Defendant Scherman that his repeated use of lethal force was unconstitutional when Lewis approached Scherman in a "small" hallway, "mov[ing] his arms in a windmill motion" after Scherman has just observed Lewis "pummeling Box until Box disappeared from Scherman's line of sight." *Lewis*, 2021 WL 2815851, at *7 (internal quotes omitted). Accordingly, Plaintiffs have failed to meet their burden of showing the law was clearly established such "that *every* reasonable [officer] would have understood" that the force Scherman used against Lewis was

18

excessive under the circumstances presented. *Rivas-Villegas*, 142 S. Ct. at 7 (emphasis added) (quoting *Mullenix,* 577 U.S. at 11).

The judgment of the district court denying Defendant Scherman qualified immunity is reversed and this case is remanded for entry of judgment in his favor.

REVERSED and REMANDED.